**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STUART CHANDLER, individually
and on behalf of a class of others
similarly situated,
                    *Plaintiff-Appellant,*

v.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,
                    *Defendant-Appellee.*

No. 09-55123

D.C. No.
2:08-cv-03184-
GAF-E
Central District of
California,
Los Angeles

ORDER

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
March 5, 2010—Pasadena, California

Filed March 17, 2010

Before: Pamela Ann Rymer and Kim McLane Wardlaw,
Circuit Judges, and Stephen M. McNamee,*
Senior District Judge.

*The Honorable Stephen M. McNamee, Senior United States District
Judge for the District of Arizona, sitting by designation.

## COUNSEL

Don Howarth, Howarth & Smith, Los Angeles, California, for the plaintiff-appellant.

Kevin J. Dunne, Sedgwick, Detert, Moran & Arnold LLP, San Francisco, California, (argued); Kirk C. Jenkins, Sedgwick, Detert, Moran & Arnold LLP, Chicago, Illinois, for the defendant-appellee.

## ORDER

We affirm for the reasons stated by the district court in its published opinion at 596 F.Supp.2d 1314 (C.D. Cal. 2008), attached as Appendix A.

AFFIRMED.

# APPENDIX A

JS-6
LINK: 19

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Stuart Chandler,

    Plaintiff,

  v.

State Farm Mutual Automobile
Insurance Company,

    Defendant.

Case No. CV 08-03184 GAF (Ex)

ORDER & MEMORANDUM
REGARDING MOTION TO DISMISS

## I. INTRODUCTION

This putative class action presents the Court with the question whether an insurer is permitted to recoup a payout from a third-party tortfeasor's insurance company before the insured has sued the third-party tortfeasor, and without first making the insured whole. Plaintiff Stuart Chandler purchased from defendant State Farm Mutual Auto Insurance Company an automobile insurance policy that reimburses policyholders for 80% of their out-of-pocket rental car costs while their automobiles are being repaired following covered accidents. Plaintiff suffered such an accident in March 2007 when his car was rear-ended by the driver of another car. Plaintiff rented a car, which cost him approximately $300, and State Farm reimbursed him 80% of those costs. Then, State Farm, as a partial subrogee of Plaintiff, sought reimbursement from the third-party tortfeasor's insurer, which questioned the charge

and paid State Farm only $70. State Farm apparently accepted the $70 payment. Plaintiff then likewise sought reimbursement of his out-of-pocket rental costs from the third-party tortfeasor's insurer, which refused to pay. Rather than institute a lawsuit against the driver who rear-ended him, Plaintiff demanded that State Farm pay him his out-of-pocket costs from the $70 it had received from the driver's insurance company because, according to Plaintiff, he is entitled to reimbursement from State Farm under the "made whole" rule, which purportedly bars State Farm from recovering any of its expenses until Plaintiff's rental car expenses are paid in full.

Plaintiff candidly admits that his position could defeat a carrier's ability to recoup from tortfeasors and their insurers the full amount of its payments to its policyholders, and that it would, in effect and to that extent, require an insurer to pay more than its contractual obligation to the policyholder. Plaintiff claims to find support for his position in a variety of public policy arguments. But in the end, these arguments are not persuasive because Plaintiff's position undermines the most fundamental public policy at play in this and other cases—the principle that the person ultimately responsible for causing the damage should pay for it. In situations like the one presented here, the imposition of an obligation on an insurer to pay the insured out of proceeds obtained as reimbursement for its out-of-pocket costs in paying the policyholder's claim would confer greater rights on the policyholder than provided in the policy and eliminate any incentive on the part of the policyholder to seek reimbursement from the tortfeasor. The policyholder's carrier would end up short changed, and the tortfeasor would be off the hook even though the tortfeasor caused the damage in the first place. Although no California case addresses this question, a case from New York provides that a carrier may pursue reimbursement and has no obligation to make the policyholder "whole" out of reimbursement proceeds unless and until the policyholder attempts and fails to recover from the tortfeasor. Winkelmann v. Excelsior Ins. Co., 650 N.E.2d 841, 843–45 (N.Y. 1995). The Court finds the reasoning in Winkelmann persuasive and consistent with the

fundamental notion that, whenever possible, the tortfeasor should bear responsibility for losses resulting from her conduct.

For these reasons, which are discussed in greater detail below, the Court concludes that Plaintiff lacks standing to proceed with his lawsuit, and that Plaintiff's claims are unripe. Defendant's motion to dismiss is therefore **GRANTED**, and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**.

## II. BACKGROUND

In March 2007, Plaintiff suffered damage to his car when he was rear-ended by the driver of another car. (First Am. Compl. ("FAC") ¶ 23.) At the time, Plaintiff owned automobile insurance through Defendant. (See FAC, Ex. 1 [Policy].) While his car was being repaired, Plaintiff rented a car and incurred $317.45 in expenses. (FAC ¶ 24.) Pursuant to the terms of Plaintiff's insurance policy, Defendant paid 80% of Plaintiff's rental car expenses, or $253.96, and Plaintiff paid $63.49. (FAC ¶ 24; see FAC, Ex. 1 [Policy at 18–19].) Subsequently, Defendant demanded reimbursement from the third-party insurer of its $253.96 payment. (FAC ¶ 25.) Defendant did not demand reimbursement of the $63.49 paid by Plaintiff. (Id.) The third-party insurer disputed the propriety of the duration of the car rental and the rental rate, and paid Defendant only $70.00 as payment-in-full for Plaintiff's rental car expenses. (FAC ¶ 26.)

Subsequently, Plaintiff contacted the third-party insurer and requested reimbursement of his $63.49. (FAC ¶ 27.) The third-party insurer rejected Plaintiff's demand for reimbursement of the $63.49, claiming that it had already paid Defendant the full amount of reimbursement owed on the car rental. (Id.) This prompted Plaintiff to seek reimbursement from Defendant of the $63.49. (FAC ¶ 28.) After Defendant also rejected Plaintiff's demand, Plaintiff initiated the present putative class action lawsuit against Defendant, asserting claims of (1) violation of California's

Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.; (2) conversion, (3) unjust enrichment; and (4) declaratory relief.

### III. DISCUSSION

Defendant seeks to dismiss Plaintiff's suit on a number of procedural grounds, including lack of standing, unripe claims, and failure to state a claim for which relief may be granted. All of Defendant's arguments, however, boil down to one central legal issue: the "made-whole" rule's applicability under the present circumstances.

California courts are silent on the issue of the made-whole rule's applicability to situations in which an insured has not yet sued the third-party tortfeasor, but the insurer has already obtained reimbursement of the policy payout from the third-party tortfeasor's insurer. Accordingly, to resolve the matter before it, the Court must look to the general principles governing the doctrine of subrogation and the made-whole rule, as well as persuasive authority and public policy considerations.

### A. SUBROGATION AND THE MADE-WHOLE RULE

#### 1. GENERAL PRINCIPLES

Subrogation is an equitable doctrine that permits an insurance company to assert the rights and remedies of an insured against a third party tortfeasor. Allstate Ins. Co. v. Mel Rapton, Inc., 92 Cal. Rptr. 2d 151, 156 (Ct. App. 2000) (citing Rossmoor Sanitation, Inc. v. Pylon, Inc., 532 P.2d 97, 104 (Cal. 1975)). The doctrine's purpose is "to prevent the insured from obtaining a double recovery (and thus being unjustly enriched) and to place the responsibility for paying the loss on the party who caused the loss." Allstate Ins. Co. v. Superior Court, 60 Cal. Rptr. 3d 782, 787 (Ct. App. 2007), appeal docketed on other grounds, No. S154790. "When an insurance company pays out a claim on a first-party insurance policy to its insured, the insurance company is subrogated to the rights of its insured against any tortfeasor who is liable to the insured for the insured's damages." Progressive West Ins. Co. v. Superior Court, 37 Cal. Rptr. 3d 434, 441 (Ct. App. 2006). In other words, an insurer "step[s] into the shoes of the insured and assert[s] the insured's rights

4

against the third party." Id. at 442. Subrogation is thus a purely derivative doctrine: "An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. . . . Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." Transcon. Ins. Co. v. Ins. Co. of Pennsylvania, 56 Cal. Rptr. 3d 491, 498 (Ct. App. 2007) (internal quotation marks omitted) (quoting Fireman's Fund Ins. Co. v. Maryland Cas. Co., 77 Cal. Rptr. 2d 296, 303 (Ct. App. 1998)).

The made-whole rule is a common law exception to insurers' right of subrogation. Allstate Ins., 60 Cal. Rptr. 3d at 788. In general, the doctrine "precludes an insurer from recovering any third party funds unless and until the insured has been made whole for the loss." Id. (emphasis omitted). "The applicability of the doctrine generally depends on whether the insured has been completely compensated for all the elements of damages, not merely those for which the insurer has indemnified the insured." Id. at 789. California courts recognize two general limitations on the applicability of the made-whole rule. See id. at 789–90. First, an insurer may disclaim the made-whole rule in an insurance contract by using clear and specific language that indicates the parties' intent to permit the insurer to seek reimbursement even if the insured has not been made whole. Id. at 789 (citing Progressive West, 37 Cal. Rptr. 3d at 443; Sapiano v. Williamsburg Nat'l Ins. Co., 33 Cal. Rptr. 2d 659, 661–62 (Ct. App. 1994)). Second, the made-whole rule does not apply if the insurer participates in prosecuting the claim against the third-party tortfeasor. Id. at 790 (citing Progressive West, 37 Cal. Rptr. 3d at 442; Travelers Indem. Co. v. Ingebretsen, 113 Cal. Rptr. 679, 685 (Ct. App. 1974)). Neither limitation applies here because Defendant's policy agreement does not contain clear and specific language that would indicate the parties' intent to abrogate the made-whole rule (see FAC ¶ 14; Ex. 1 [Policy at 24]), and Defendant has not had the

5

opportunity to participate in the prosecution of Plaintiff's claim against the third-party tortfeasor because Plaintiff has not initiated any such lawsuit.

### 2. APPLICATION

As noted above, California courts have not squarely addressed the core issue presently before the Court, namely, whether an insurer must make the insured whole before pursuing a subrogation claim against the third-party tortfeasor's insurer where the insured herself has not yet sued the third-party tortfeasor. A case decided by the New York Court of Appeals, however, is directly on point.

In Winkelmann v. Excelsior Ins. Co., 650 N.E.2d 841 (N.Y. 1995), the plaintiffs were property owners whose building was severely damaged by a fire allegedly caused by the negligence of a roof repairman, which resulted in nearly $320,000 in property damage. Id. at 842. The defendant insurance company, Excelsior Insurance Company ("Excelsior"), paid the plaintiffs over $221,000, thereby fully satisfying its obligation under the plaintiffs' policy. Id. Subsequently, the plaintiffs sought to recover damages for the remaining amount from the roof repairman, while Excelsior sought to recoup its payout. Id. The third-party insurer, Colonial Indemnity Insurance Company ("Colonial"), offered over $188,000 to the parties to settle their claims, only $9,500 of which would go to the plaintiffs. Id. The plaintiffs refused to settle, but Excelsior agreed to receive $180,000 in exchange for releasing its subrogation claim. Id. The plaintiffs then sued the roof repairman, and several months later, also sued Excelsior. Id. at 842–43. The plaintiffs claimed that, by accepting Colonial's settlement offer, Excelsior had acted in derogation of the plaintiffs' rights, because the settlement hindered their ability to prosecute and settle their claim against the roof repairman. Id. at 843.

Before reaching the merits of the plaintiffs' claim against Excelsior, the Winkelmann court explained that the plaintiffs' claim against Excelsior was "premature" because the plaintiffs

6

> may yet recover the balance of their losses in the action against [the third-party tortfeasor]. There is no evidence that [the tortfeasor's] policy with Colonial has been exhausted or that his personal assets are insufficient to satisfy any additional liability to plaintiffs. Accordingly, Excelsior has not caused its insureds any damages yet. Insofar as plaintiffs allege that Excelsior's conduct "forced" them to litigate rather than settle their claim against [the third-party tortfeasor], that claim, even if true, does not state a cause of action against Excelsior for impairing plaintiffs' rights.

Id. The court then addressed the merits of the plaintiffs' claim by tackling the main issue in the case: "whether an insurer who has paid its insured the full amount due under a fire policy, but less than the insured's loss, may proceed against the third-party tortfeasor responsible for the loss before the insured has been made whole by the tortfeasor." Id. at 842. The court held that an equitable subrogee need *not* delay seeking recovery from a third-party tortfeasor until the insured has exhausted her efforts to collect therefrom. Id. at 845. In reaching this conclusion, the court first recognized that the "dual objective" of the subrogation doctrine is to prevent double-recovery by the insured and "to require the party who has caused the damage to reimburse the insurer for the payment the insurer has made." Id. at 844. The court then acknowledged that "[an] insurer's obligation runs to its insured, and then only to the extent of the policy limits." Id. "Thus, an insurer's action based on partial subrogation through its insured will not necessarily interfere with the insured's right to be made whole by the tortfeasor and . . . the insurer need not delay its subrogation claim against the third party to avoid impairing the insured's rights." Id. In addition, the court discounted the possibility that an insurer's recoupment of its payout might result in "unequal bargaining positions" between the insured and the third-party tortfeasor's insurer by taking away the incentive of the latter to engage in settlement negotiations. Id. at 845. Finally, the court reasoned that "i[f] the insurer is required to forego its rights while the insured delays in asserting its claim against the third party, . . . the delay may compel the insurer to litigate a stale claim, or worse, may result in its action being time barred." Id.

7

The Court finds Winkelmann's holding and reasoning to be persuasive and adopts the rule enunciated therein in the absence of direct California authority. Moreover, the Court concludes that Winkelmann does not conflict with California case law on subrogation or the relevant public policy considerations underlying the made-whole rule.

The right of subrogation is, in essence, a means of balancing the equities as between the insurer, the insured, and the third-party tortfeasor. An insured who has suffered an injury has a legal right to be made whole; the made-whole rule is the legal doctrine that prevents insurers from interfering with that right. But where the insured has been fully compensated for his injury, subrogation ensures that the insured is not unjustly enriched by receiving a windfall. Subrogation's primary purpose, therefore, is to prevent the insured from obtaining double recovery. See Allstate Ins., 60 Cal. Rptr. 3d at 789. Additionally, the subrogation doctrine is founded upon the equitable principle that, "as between the insurer and insured, it is fair to place the burden for any nonrecovery of damages on the insurer," whom the insured pays, and who is in a better position, to bear the loss. Id. (citing cases from other jurisdictions); see also Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 223:136, at 223-152 to -153 (3d ed. 2000). Subrogation is also a "principle of priority: where the wrongdoer has a fixed amount of assets, it is fair that the insured has the priority of rights to collect the full amount of compensation before the insurer may seek to collect from the wrongdoer." Allstate Ins., 60 Cal. Rptr. 3d at 789.

These public policy considerations do not compel a result contrary to that which the Court reaches today. First, one must keep subrogation claims against insureds separate from subrogation claims against third-party tortfeasors. As between insureds and insurers, California law is clear that an insurer may seek subrogation *from an insured* only if the insured's recovery exceeds that to which he is entitled, i.e., only after the insured has been made whole. See Sapiano, 33 Cal. Rptr. 2d at 660. This is to prevent situations in which an insured is not made whole,

8

but the insurer, who has already received premium payments from the insured, is able to recoup the proceeds of its payout. However, this rationale is inapposite where, as here, the insured has not yet sought to recover from the third-party tortfeasor and the insurer·seeks subrogation directly from the tortfeasor's insurer, because under such circumstances, there is no indication that the insured will not be made whole if he sues the third-party tortfeasor. Cf. Muller v. Society Ins., 750 N.W.2d 1, 15 (Wis. 2008) ("[T]he made whole doctrine . . . does not apply when the inequitable prospect of an insurer competing with its own insured for limited settlement funds is absent."). Rather, the insurer should bear the risk of loss only where it is clear that "the loss of one of the two must go unsatisfied." Winklemann, 650 N.E.2d at 845.

Furthermore, the fundamental purpose of the doctrine of subrogation is to hold third-party tortfeasors accountable for the injuries they inflict: "'Subrogation is the insurer's right to be put in the position of the insured, *in order to recover from third parties who are legally responsible to the insured for a loss paid by the insurer*.'" Plut, 102 Cal. Rptr. 2d at 40 (emphasis added) (quoting Barnes v. Indep. Auto. Dealers of California, 64 F.3d 1389, 1392 (9th Cir. 1995)). A rule that would prevent an insurer from recouping its payout until after the insured has been made whole would place the risk of loss on the insurer whenever the insured does not attempt to recover from the third-party tortfeasor, even when the insured could obtain a full recovery from the third-party tortfeasor. Just as an insurer may not sit back and allow the insured to recover against the third-party tortfeasor, and then demand all the proceeds for itself, Sapiano, 33 Cal. Rptr. 2d at 662, an insured may not sit back and do nothing to assert its rights against the responsible party, and then expect to be made whole by the insurer who enforces its right of subrogation.

Finally, a rule requiring insurers to make insureds whole before subrogating themselves to insureds' claims would remove virtually any incentive the insured might have to pursue her claims against the third-party tortfeasors, because the insured

9

could simply take her share from the amount recouped in subrogation by the insurer. Thus, in effect, the insurer would be obligated to compensate the insured in full for the latter's injuries if the insurer sought to recoup any portion of its payout, even where, as here, the express terms of the insurance policy required something less. Under the present circumstances, Plaintiff's position would ultimately frustrate the parties' objective intent in entering into the agreement, by requiring Defendant to pay 100% of Plaintiff's rental expenses when Plaintiff plainly agreed that Defendant was obligated to pay only 80% of such expenses.

Plaintiff contends that Defendant's position in this case opens the door to an anomaly whereby the made-whole rule will not apply where an insured has not yet sued the third-party tortfeasor, but will apply to an insured who sues the tortfeasor and settles for $1.00. Plaintiff also argues that Defendant's position would permit insurers to grab the "lower-hanging fruit," leaving the insured to have to reach higher for a smaller recovery. As explained above, Winkelmann addressed and dismissed Plaintiff's latter argument, which is essentially a reformulation of the Winkelmann plaintiffs' "unequal bargaining position" argument. With respect to Plaintiff's anomaly argument, the Court is not convinced that an insured could circumvent the rule espoused by the Court today so easily. First, as a practical matter, it is highly unlikely that an insured would settle its claim against a third-party tortfeasor—the source of the insured's injury—for $1.00 just so it could then be made whole by her own insurer, especially where there is a chance that the insured might be made whole by the third-party tortfeasor. Moreover, at least in cases in which the insurer is representing both the insurer and insured, it is unlikely that the insurer's attorney would settle a claim for $1.00 where it was clear that the purpose of so settling would be to preclude the insurer from subrogating to the insured's claims before the latter was made whole. See Unigard Ins. Group v. O'Flaherty & Belgum, 45 Cal. Rptr. 2d 565, 568 (Ct. App. 1995) ("[W]hen, pursuant to insurance policy obligations, an insurer hires and compensates counsel to defend an insured, provided that the

interests of the insurer and insured are not in conflict, the retained attorney owes a duty of care to the insurer . . . ."). Thus, Plaintiff's arguments do not compel a different conclusion than that reached by the Court today.

**B. DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(B)(1)**

With the foregoing analysis in mind, the Court now directly addresses the merits of Defendant's motion to dismiss. On a motion to dismiss for lack of standing, a district court must accept as true all material allegations in the complaint, and must construe the complaint in the nonmovant's favor. Bernhardt v. County of Los Angeles, 279 F.3d 862, 867 (9th Cir. 2002). The Court may not speculate as to the plausibility of the plaintiff's allegations. See id.

As noted above, Defendant moves to dismiss Plaintiff's lawsuit under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that Plaintiff lacks standing, and that his claims are unripe. The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, inter alia, that plaintiffs have standing and that claims be "ripe" for adjudication. Allen v. Wright, 468 U.S. 737, 750 (1984). The party asserting federal subject matter jurisdiction bears the burden of proving its existence. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994). Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication. Erwin Chemerinsky, Federal Jurisdiction § 2.3.1, at 57 (5th ed. 2007); see also Allen, 468 U.S. at 750–51. The related doctrine of ripeness is a means by which federal courts may dispose of matters that are premature for review because the plaintiff's purported injury is too speculative and may never occur. Chemerinsky, supra, § 2.4.1, at 117. Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss. See St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989); see also White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

"[T]he irreducible constitutional minimum of standing contains three elements," all of which the party invoking federal jurisdiction bears the burden of establishing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). First, the plaintiff must prove that he suffered an "injury in fact," i.e., an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (citations, internal quotation marks, and footnote omitted). Second, the plaintiff must establish a causal connection by proving that her injury is fairly traceable to the challenged conduct of the defendant. Id. at 560–61. Third, the plaintiff must show that her injury will likely be redressed by a favorable decision. Id. at 561.

In the present case, Plaintiff lacks standing because he has not alleged, and indeed, cannot allege at this juncture, sufficient facts to establish that his injury is fairly traceable to Defendant's conduct. The challenged conduct underlying Plaintiff's lawsuit consists of Defendant's act of obtaining partial reimbursement of the $253.96 it paid Plaintiff from the third-party tortfeasor's insurer without first making Plaintiff whole. To have standing to sue under the made-whole rule, Plaintiff must show that he was foreclosed from recovering from the tortfeasor because of Defendant's act of seeking and obtaining reimbursement of the rental car expenses. See Winkelmann, 650 N.E.2d at 843. At this time, the allegation that Defendant caused Plaintiff to lose $63.49 has no basis because, as explained in detail above, Plaintiff has not yet attempted to recover that sum from the third-party tortfeasor. In other words, without first attempting to recover the $63.49 from the tortfeasor, Plaintiff cannot show that Defendant has done anything to impair Plaintiff's ability to assert his rights and recover the $63.49. Accordingly, Plaintiff cannot establish that his injury is fairly traceable to Defendant.

For essentially the same reasons, Plaintiff's claims are unripe. "[T]he question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Pac. Gas & Elec. Co. v. State Energy

Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (internal quotation marks omitted) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). "The 'central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Richardson v. City and County of Honolulu, 124 F.3d 1150, 1160 (9th Cir. 1997) (quoting 13A Charles Alan Wright et al., Federal Practice and Procedure § 3532, at 112 (2d ed. 1984)).

Here, Plaintiff's lawsuit is unripe because Plaintiff has not sufficiently established that he cannot recover the $63.49 from the third-party tortfeasor. Unless and until Plaintiff sues the third-party tortfeasor and is unable to recover the amount he claims he is owed, Plaintiff cannot claim that Defendant has prevented him from recovering that amount. Thus, at this stage, Plaintiff's claims involve future events that are too uncertain and speculative to permit Plaintiff to proceed with his lawsuit.

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that Plaintiff lacks standing and that his claims are unripe. Accordingly, Defendant's Rule 12(b)(1) motion to dismiss is **GRANTED**, and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE.**[1]

**IT IS SO ORDERED.**

DATED: December 29, 2008

Judge Gary Allen Feess
United States District Court

---

[1]Because the Court concludes that Plaintiff lacks standing to pursue his claims, it does not address Defendant's motion to dismiss for failure to state a claim.