ALLSTATE INSURANCE COMPANY *v.* STEPHEN PALUMBO ET AL.
(SC 18276)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued October 21, 2009—officially released May 18, 2010

*Neil Johnson*, for the appellant (named defendant).

*Jeremiah J. O'Connor*, for the appellee (plaintiff).

Opinion

KATZ, J. The issue in this certified appeal is whether the Appellate Court properly affirmed the judgment of the trial court concluding that the plaintiff, Allstate Insurance Company, could hold the named defendant, Stephen Palumbo (defendant),[1] liable under the doctrine of equitable subrogation to recover damages the plaintiff had paid under a homeowner's insurance policy issued to its insured, the defendant's fiancée, with whom he lived. See *Allstate Ins. Co.* v. *Palumbo*, 109 Conn. App. 731, 952 A.2d 819 (2008). The defendant contends that, in light of the particular facts of the relationship between himself and the plaintiff's insured: (1) he was a tenant of the insured and thus was not subject to equitable subrogation by the plaintiff; and (2) the public policy against economic waste, as well the expectations of the defendant and the plaintiff's insured, prohibit an action for equitable subrogation. We conclude that the equities clearly weigh against allowing the plaintiff to recover from the defendant

---

[1] The plaintiff also had asserted a claim against the defendant Rock-Vern Electric, Inc. (Rock-Vern), alleging that the defendant was an employee and principal of Rock-Vern and that, under the theory of respondeat superior, Rock-Vern was liable for the defendant's alleged negligent act. The defendant filed an answer denying that he was working for Rock-Vern at the time that he engaged in the alleged negligent act, and the president of Rock-Vern subsequently submitted an affidavit consistent with that denial. Thereafter, the plaintiff withdrew its claim against Rock-Vern. References herein to the defendant, therefore, are to Stephen Palumbo only.

under this doctrine and, therefore, we reverse the Appellate Court's judgment.

The record reveals the following facts, as found by the trial court, and procedural history. On January 31, 2002, a fire occurred at the single-family home owned by the plaintiff's insured, Lisa Deveau, the defendant's fiancée, a residence that she shared with her daughter and the defendant. The cause of the fire was a water heater that the defendant had installed improperly. After the fire, Deveau filed a claim under her homeowner's policy with the plaintiff, on which she was the sole named insured. The plaintiff ultimately paid Deveau $62,615.25 to cover damages and expenses she had incurred as a result of the fire.

In January, 2004, the plaintiff commenced an action for equitable subrogation against the defendant, alleging that his negligence had caused the fire and that the plaintiff was entitled to recover from him the sum that it had paid to Deveau under her homeowner's policy. In his amended answer, the defendant conceded that he negligently had installed the water heater that caused the fire, but asserted the following special defenses to preclude the action against him: (1) that he was an insured under the policy; (2) that he and Deveau were in a landlord-tenant relationship; (3) that he was a lodger; and (4) that subrogation was not equitable. In light of the defendant's concession of negligence, the trial to the court was limited to the special defenses and issues relating to damages.

The trial court rendered judgment in favor of the plaintiff.[2] The trial court concluded that the defendant's

[2] Although the trial court initially awarded the plaintiff damages in the amount of $62,615.25, in light of the plaintiff's concession in closing argument to the trial court that it had paid Deveau $1121.96 in error for the value of the defendant's personal property, the trial court ordered the defendant to pay damages in the amount of $61,493.29.

status as the fiancé of Deveau, the named insured, did not fall within the definition of covered persons under the policy.[3] In rejecting the remaining special defenses, the trial court reasoned: "The defendant argues that by virtue of their having resided together for five and [one-half] years, and by their sharing of expenses, a landlord-tenant relationship was created between [Deveau and himself]. General Statutes § 47a-1 (*l*) defines tenant as 'the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others . . . .' By his own admission, [the defendant] conceded that he did not occupy any part of the premises to the exclusion of others nor did he have a fixed amount of rent or a fixed period of occupancy. Based on the testimony, the court must conclude that it was never intended by the parties, either expressly or impliedly, that a landlord-tenant relationship would arise. . . . Black's Law Dictionary [3d Ed. (1933)] defines a houseguest as 'a traveler who lodges at an inn or tavern with the consent [of] the keeper. A guest, as distinguished from a boarder, is bound for no stipulated time. He stops at the inn for as short or as long as he pleases, paying, while he remains, the customary charge.' Just as . . . Deveau could have brought an action in negligence against [the defendant], so too can [the plaintiff] by virtue of equitable subrogation. This was the analysis utilized by the court in *Wasko* v. *Manella*, 269 Conn. 527 [849 A.2d 777] (2004), which determined that a social houseguest who negligently caused a fire was liable to the insurer [that] paid the claim for the insured loss." In light of its conclusion that the status of the defendant was dispositive, the trial court did not address the defendant's claim that

---

[3] Covered persons under the policy included the named insured and residents of the household if they were a relative or a dependent person in the care of the insured. The trial court noted that the defendant had produced no legal authority that a fiancé is a relative. That legal determination is not at issue in this certified appeal.

it was inequitable, under the particular facts of this case, to allow a subrogation claim.

The defendant appealed from the trial court's judgment to the Appellate Court, which rejected the defendant's contention that he was not subject to equitable subrogation and affirmed the judgment. *Allstate Ins. Co.* v. *Palumbo*, supra, 109 Conn. 733. In so doing, the court relied on *DiLullo* v. *Joseph*, 259 Conn. 847, 792 A.2d 819 (2002), and *Wasko* v. *Manella*, supra, 269 Conn. 527, as setting forth the controlling principles. *Allstate Ins. Co.* v. *Palumbo*, supra, 737. The Appellate Court noted that, in *DiLullo*, this court had held that, in the absence of an express agreement, there was no right of equitable subrogation against a tenant by a landlord's fire insurer. Id. By contrast, the Appellate Court noted that, in *Wasko*, this court had held that there was a right of equitable subrogation against a social guest by the homeowner's fire insurer. Id. In concluding that *DiLullo* did not control in the present case, the Appellate Court cited to definitions in the General Statutes applicable to landlord-tenant law, specifically, those for the terms "landlord," "tenant," "rental agreement" and "rent." Id., 738 (citing to subsections of § 47a-1).[4] In light of those definitions, the defendant's failure to pay a security deposit, and the absence of a fixed rent, a fixed period of occupancy or an area of the house over which he had exclusive possession, the Appellate Court

---

[4] General Statutes § 47a-1 provides in relevant part: "(d) 'Landlord' means the owner, lessor or sublessor of the dwelling unit, the building of which it is a part or the premises. . . .

"(h) 'Rent' means all periodic payments to be made to the landlord under the rental agreement.

"(i) 'Rental agreement' means all agreements, written or oral, and valid rules and regulations adopted under section 47a-9 or subsection (d) of section 21-70 embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises. . . .

"(*l*) 'Tenant' means the lessee, sublessee or person entitled under a rental agreement to occupy a dwelling unit or premises to the exclusion of others or as is otherwise defined by law. . . ."

concluded that the trial court properly had found that there was no express or implied landlord-tenant relationship. Id., 739. Instead, the Appellate Court determined that "[t]his case is but an extension of *Wasko* . . . . The defendant was more like a social houseguest of [Deveau] because he could remain as an occupant of [her] house for only as long as she chose to allow him to do so and because he had few characteristics of a tenant." Id., 741. This certified appeal followed.[5]

We begin with the general principles of equitable subrogation. "The object of [equitable] subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. . . . As now applied, the doctrine of . . . equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (Internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 269 Conn. 532–33.

---

[5] Although the defendant also had raised several claims in the Appellate Court relating to damages, we granted his petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the trial court's determination that the [defendant], who resided in an apartment and caused damage to the premises, was liable under the doctrine of equitable subrogation to the insurer of the tenant?" *Allstate Ins. Co.* v. *Palumbo*, 289 Conn. 954, 961 A.2d 419 (2008). We note that this court incorrectly framed the certified question by referring to the premises at issue as an apartment and to Deveau as a tenant. The record clearly demonstrates that the premises is a single-family, two bedroom house and that Deveau is the owner of the house. We therefore consider the appeal consistent with the actual facts. See *National Publishing Co.* v. *Hartford Fire Ins. Co.*, 287 Conn. 664, 665 n.1, 949 A.2d 1203 (2008) (rephrasing certified question containing typographical error); see also *Stamford Hospital* v. *Vega*, 236 Conn. 646, 648 n.1, 674 A.2d 821 (1996) (noting that this court may rephrase certified questions in order to render them more accurate in framing issues presented).

Under the doctrine of equitable subrogation, "[a] subrogee has no rights against a third person beyond what the subrogor had." *Continental Ins. Co.* v. *Connecticut Natural Gas Corp.*, 5 Conn. App. 53, 60, 497 A.2d 54 (1985); accord 16 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 222:5, p. 222-19 ("a subrogated insurer stands in the shoes of an insured, and has no greater rights than the insured, for one cannot acquire by subrogation what another, whose rights he or she claims, did not have"). Similarly, "[t]he insurer . . . is subject to any defenses the third party would have had against the insured." 16 L. Russ & T. Segalla, supra, p. 222-21.

Although "[s]ubrogation is a highly favored doctrine . . . which courts should be inclined to extend rather than restrict"; (internal quotation marks omitted) *Wasko* v. *Manella*, supra, 269 Conn. 543; "[t]here is no general rule to determine whether a right of subrogation exists. Thus, ordering subrogation depends on the equities and attending facts and circumstances of each case." 73 Am. Jur. 2d 552, Subrogation § 10 (2001). "The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court. *Kakalik* v. *Bernardo*, 184 Conn. 386, 395, 439 A.2d 1016 (1981); *Robert Lawrence Associates, Inc.* v. *Del Vecchio*, 178 Conn. 1, 18–19, 420 A.2d 1142 (1979); *Gager* v. *Gager & Peterson, LLP*, 76 Conn. App. 552, 560, 820 A.2d 1063 (2003). . . . When the trial court draws conclusions of law from its balancing of the equities, however, our review is plenary. *Torres* v. *Waterbury*, 249 Conn. 110, 118, 733 A.2d 817 (1999)." (Citations omitted; internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 542–43.

Turning to the case at hand, we agree with the Appellate Court that our decisions in *Wasko* and *DiLullo* provide the controlling principles to be applied in the present case. We disagree with the Appellate Court,

however, insofar as it determined that those cases required the trial court to categorize the relationship between the parties as either landlord-tenant or host-social guest and to decide whether an action in equitable subrogation could be brought on the basis of that characterization.

In *DiLullo*, the issue before this court was whether, in the absence of a specific agreement between the landlord and the tenant covering the matter, the landlord's fire insurer had a right of equitable subrogation against the tenant for negligently having caused a fire that damaged the landlord's property. *DiLullo* v. *Joseph*, supra, 259 Conn. 848. This court answered that question in the negative, relying on two equitable considerations relating to policy and fairness. Id., 851, 853–54. First, this court cited the strong public policy against economic waste, reasoning that "a default rule that allocates to the tenant the responsibility of maintaining sufficient insurance to cover a claim for subrogation by his landlord's insurer . . . would create a strong incentive for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the replacement cost, of the entire building, irrespective of the portion of the building occupied by the tenant. That is precisely the same value or replacement cost insured by the landlord under his fire insurance policy. Thus, although the two forms of insurance would be different, the economic interest insured would be the same." Id., 854. Second, this court cited "the likely lack of expectations regarding a tenant's obligation to subrogate his landlord's insurer." Id., 851. We concluded that, "in most instances, neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them." Id., 854.

Thereafter, in *Wasko* v. *Manella*, supra, 269 Conn. 545, this court concluded that neither of the two con-

cerns cited in *DiLullo* were implicated in a situation in which a social houseguest negligently had caused a fire that damaged the hosts' property. In regard to the first consideration in *DiLullo*, economic waste, this court noted that the insureds in *Wasko* had a fire insurance policy covering their home, whereas "the negligent acts of a social houseguest would already be covered by his or her existing third party liability coverage, such as provided by a homeowner's or renter's insurance policy. Therefore, there is no need for a social houseguest to purchase an additional traveling or temporary first party fire insurance policy on the host's property. The social guest will be covered in the same manner as he or she would be in any other situation where he or she negligently caused injury to another—through traditional third party liability coverage. . . . [W]e see no reason why it is equitable to permit a property owner to proceed against a negligent houseguest's current insurance policy, yet it is inequitable to permit an insurance company that has paid out to its insured to proceed against that same policy. . . . In either situation, the houseguest's current third party liability insurance coverage will protect against liability, and there is no need for houseguests to obtain . . . additional policies . . . ." (Citations omitted.) Id., 545–47. With respect to the second consideration in *DiLullo*, expectations of the parties, the court in *Wasko* reasoned "that most social guests fully expect to be held liable for their negligent conduct in another's home—whether that conduct constitutes breaking the television, causing physical injury, or burning the house down.[6] Unlike tenants, social guests have not signed a contract with the host, they have not paid the host any set amount of money for rent, and, accordingly, they do not have

---

[6] Indeed, in *Wasko* v. *Manella*, supra, 269 Conn. 529, the hosts had initiated the action against the guest, and the insurer later was substituted as the real party in interest.

the same expectations regarding insurance coverage for the property as do tenants. In sum, the equitable concerns that led this court to preclude subrogation in the context of landlord and tenant simply are not present in the context of houseguest and host." Id., 547.

With the framework applied in *DiLullo* and *Wasko* in mind, we note the following additional uncontested facts reflected in the record that the trial court apparently credited, but did not deem relevant in their particulars.[7] The defendant moved in with Deveau shortly after she purchased the subject property. Deveau's house was the defendant's sole residence, and the defendant did not have insurance covering any other property. The defendant had been cohabiting with Deveau for approximately two and one-half years before the fire occurred and more than four years at the time the plaintiff commenced this action against him.

After the defendant moved into Deveau's house, he and Deveau informally agreed that they would share equally *all* of the expenses for the house, including all of the bills, repairs and upgrades to the house. Deveau

[7] The facts on which we rely were adduced through the testimony of the defendant and Deveau, as well as an affidavit from Deveau that was submitted, without objection, as a full exhibit. The plaintiff did not introduce any evidence to discredit these factual assertions. The plaintiff also does not challenge any of these facts on appeal and, indeed, has conceded the material facts, including the defendant's contributions toward payment of the insurance premiums, in its brief and at oral argument before this court. Moreover, the trial court expressly made the following broad findings of fact, evidencing that it had credited the testimony of the defendant and Deveau regarding their living arrangement: "Deveau and [the defendant] shared expenses for said residence [during the entire period he lived there] . . . . They shared expenses of the home which varied month to month . . . . During [the defendant's] occupancy of the subject premises, he performed many improvements and maintenance functions as if he was an owner . . . ."

We do note, however, that, although the trial court found that the defendant had moved into the subject premises on or about February, 2001, and had moved out on or about October, 2005, after the couple terminated their engagement, the undisputed evidence indicates that the defendant moved into the premises more than one year prior to February, 2001.

paid the bills after the defendant gave her cash or checks to cover his share.

Among the expenses that the defendant shared was the cost of the homeowner's insurance policy, which was included in the mortgage payment. Deveau never informed the defendant that he should obtain his own liability coverage. The defendant and Deveau both mistakenly assumed, without verifying, that the defendant's status as Deveau's fiancé and cohabitant rendered him a covered person under Deveau's policy.

The defendant also made numerous, substantial improvements to Deveau's property. He took down a wall in the house to make two rooms into one larger room. He installed hardwood floors, ceiling fans, a pellet stove, an emergency generator and a home security system. He added a wraparound porch to the house, raised the driveway fourteen inches, installed a pond in the front yard, built a shed and laid granite steps and a paver walkway. As the trial court properly noted, the defendant "performed many improvements and maintenance functions *as if he was an owner* . . . ." (Emphasis added.)

Deveau testified that she did not want the plaintiff to bring an action against the defendant because "it would be like suing me." In an affidavit submitted to the court, Deveau stated that holding the defendant, her future husband, liable would defeat the purpose for which they had obtained the homeowner's insurance because, in effect, it would mean that, even though they had paid for the coverage, they would have to pay back any money the plaintiff had paid to Deveau under the policy.

At the outset, we note that these facts demonstrate that the relationship between Deveau and the defendant reasonably cannot be deemed to be that of host-social houseguest. We also note that, although their arrange-

ment did not evidence all of the formal legal elements of a landlord-tenant relationship, they did have an oral agreement under which the defendant made monthly payments to Deveau as long as he lived there. The defendant's improvements to the property, however, clearly exceeded a tenant's legal obligations. Thus, it is clear that the defendant is neither a social houseguest nor a tenant in the strict legal sense. Contrary to the view of the Appellate Court and the trial court, however, in such a case, we do not assign the relationship to whichever category is the closest fit to determine whether subrogation is proper. In *DiLullo* and *Wasko*, the analysis did not turn on the *legal* elements of the status of the third party or the characterization of the relationship at issue. Rather, those cases turned on *equitable* considerations.[8]

Indeed, although there is a dearth of case law in this or other jurisdictions addressing subrogation under facts similar to the present case, we agree with the reasoning of the Nebraska Supreme Court that not every relationship will fit squarely into a category that will be determinative of whether a subrogation action may be brought. See *Reeder* v. *Reeder*, 217 Neb. 120, 124, 348 N.W.2d 832 (1984). In addressing similar competing arguments by the parties in the case before it, the Nebraska court reasoned that attempting to categorize

[8] We note that the parties agree both that the trial court and the Appellate Court improperly characterized the relationship between Deveau and the defendant as host-social houseguest and that the relationship more properly is characterized as a nonmarried cohabiting couple. They each suggest that this court could adopt a bright line rule allowing or barring subrogation when the insured and the third party are such a couple. In support of his contention, the defendant points to the ever growing number of nonmarried couples living together. Because the status of the defendant and Deveau as a nonmarried, cohabiting couple is only one of many facts relevant to the balancing of the equities in the present case, we decline the parties' invitation to consider such a bright line rule, which could have a significant impact either on insurers or such couples, until we are presented with a case in which that status is the sole or principal factor.

the relationship at issue as either landlord-tenant or licensor-licensee, as the parties had argued, was "[n]either material [n]or helpful. One of the difficulties we too often encounter in the law is our effort to attempt to force every situation into a known and recognized relationship, hoping that by doing so the answer to our question may of necessity automatically follow. In the instant case, we believe the facts would disclose that the relationship created between [the insured] and [the third party] . . . was neither landlord/tenant nor licensor/licensee in the full legal sense. To be sure, the relationship has characteristics of both landlord/tenant and licensor/licensee, but of a separate and unique kind, and in this instance meriting a different treatment." Id.

In the present case, because it determined that the status of the defendant was dispositive, the trial court did not address the defendant's claim that it was inequitable, under the facts, to allow subrogation. Therefore, the court failed to balance the equities to determine whether the particular facts of this case make subrogation proper. Accordingly, its failure to exercise its discretion to make that determination was improper. See *Higgins* v. *Karp*, 243 Conn. 495, 504, 706 A.2d 1 (1998) ("[w]here, as here, the trial court is properly called upon to exercise its discretion, its failure to do so is error" [internal quotation marks omitted]); *State* v. *Lee*, 229 Conn. 60, 73–74, 640 A.2d 553 (1994) ("[i]n the discretionary realm, it is improper for the trial court to fail to exercise its discretion"). Nonetheless, because the material underlying facts are undisputed and, for the reasons set forth below, the equities so clearly weigh against the plaintiff prevailing in the present subrogation action, we conclude that the proper exercise of the trial court's discretion could have yielded only one result, namely, a determination that the plaintiff cannot prevail because subrogation would not be equitable under the facts and circumstances of the present case.

See *Wichers* v. *Hatch*, 252 Conn. 174, 181–82, 745 A.2d 789 (2000) ("Generally, we review a decision of the trial court setting aside the verdict and ordering an additur to determine whether the trial court properly exercised its discretion. . . . When, however, the trial court concludes, as a matter of law, that it is compelled to act in a particular fashion, plenary review is appropriate." [Citations omitted.]). Under these unusual circumstances, the reviewing court need not remand the case for further proceedings. See *State* v. *Lee*, 229 Conn. 60, 74–75, 640 A.2d 553 (1994) ("Ordinarily it is improper for the trial court to fail to exercise discretion if discretion is required. Nonetheless, we sustain the trial court's ruling in this case because had the trial court exercised its discretion, it could only have concluded, based upon the record in this case, that the proffered testimony was inadmissible. . . . In sum, although the trial court failed to exercise its discretion, the record makes clear that, had it done so, it could have come to only one conclusion . . . ." [Citation omitted.]); see also *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 309–10, 788 A.2d 1199 (2002) ("[W]e conclude that it is unnecessary to remand the case for a determination as to whether the plaintiff acted wilfully, as we have defined that term in the context of [General Statutes] § 20-102cc [a]. . . . We conclude [in light of certain unchallenged evidence] that the wilfulness element of the term 'resident abuse' contained in § 20-102cc [a] was satisfied as a matter of law, thus vitiating the need for a remand."); *Doe* v. *Doe*, 244 Conn. 403, 456, 710 A.2d 1297 (1998) ("[I]t is clear to us that, based on the undisputed facts of this case, the presumption has been sufficiently rebutted. Put another way, were the trial court upon our remand to fail to determine that the presumption was sufficiently rebutted, the undisputed facts of this case would compel us to conclude that its determination would be clearly errone-

ous."); *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 329 n.21, 596 A.2d 426 (1991) ("[t]he form of our remand is governed by the principle that when a trial court concludes that an administrative agency has made invalid or insufficient findings, the court must remand the case to the agency for further proceedings if the evidence does not support only one conclusion as a matter of law"), on appeal after remand, 228 Conn. 545, 636 A.2d 1360 (1994); *Chevron Oil Co.* v. *Zoning Board of Appeals*, 170 Conn. 146, 153, 365 A.2d 387 (1976) ("Generally, when the court finds the action of an administrative agency to be illegal, it should go no further than to sustain the appeal. . . . For the court to go further and direct what action should be taken by the zoning authority would be an impermissible judicial usurpation of the administrative functions of the authority. . . . When it appears, however, that the zoning authority could reasonably reach only one conclusion, the court may direct the authority to do that which the conclusion requires." [Citations omitted; internal quotation marks omitted.]); *Karantonis* v. *East Hartford*, 71 Conn. App. 859, 863, 804 A.2d 861 ("[t]here are times . . . when the undisputed facts or uncontroverted evidence and testimony in the record make a factual conclusion inevitable so that a remand to the trial court for a determination would be unnecessary" [internal quotation marks omitted]), cert. denied, 261 Conn. 944, 808 A.2d 1137 (2002).

To explain our conclusion, we turn to the particular facts of the present case in light of the equitable considerations cited in *DiLullo* and subsequently applied in *Wasko*. Turning to the first consideration, economic waste, we note that, unlike the social houseguest whom the court in *Wasko* presumed to be covered by the guest's existing third party liability coverage, which follows the houseguest as he ventures outside his own home; *Wasko* v. *Manella*, supra, 269 Conn. 546; it is

undisputed that, in the present case, the defendant had no other property on which he could have taken out insurance, whether renter's or homeowner's. Therefore, the *only* property on which the defendant possibly could have obtained coverage to protect himself against liability for his negligent conduct was Deveau's home, which she already fully had insured. Had the defendant been able to obtain a separate policy on the subject premises, such a policy necessarily would have to some extent been duplicative of Deveau's coverage.[9] Therefore, these facts demonstrate some economic waste that weighs against subrogation,[10]

[9] We note that there is no evidence in the record as to what type of coverage, if any, the defendant would have been able to obtain had he sought his own insurance policy.

[10] We note that, at oral argument, a member of this court raised an issue that previously had not been raised by either party, namely, whether the defendant could have been added as an insured to Deveau's insurance policy. The defendant admitted that this was a possibility, one which neither he nor Deveau had thought of because they believed that the defendant already was covered under that policy. The plaintiff also acknowledged that adding the defendant to the policy would have been an option, but asserted that it would have had the discretion to allow the defendant to be added or to require him to obtain his own policy. See *DiLullo* v. *Joseph*, supra, 259 Conn. 853 (citing principle that "[an] insurer has a right to choose whom it will insure" [internal quotation marks omitted]).

For several reasons, we are not inclined to conclude that there is no economic waste on the basis of the possibility that the defendant might have been added as an insured on Deveau's policy. First, the defendant would have had no control over whether he could obtain that coverage, as only Deveau could have requested the defendant's addition to her policy and the plaintiff would have had the sole discretion whether to add him as an insured. With a separate policy of his own, the defendant would be able to turn to other insurers even if the plaintiff had refused to insure him. Second, if the defendant had been added to Deveau's policy, the plaintiff would not have been able to bring an action against him, as he would be the plaintiff's own insured. See *Home Ins. Co.* v. *Pinski Bros., Inc.*, 160 Mont. 219, 226, 500 P.2d 945 (1972). Finally, even if we were inclined to consider the defendant's ability to be added to Deveau's policy as weighing against a conclusion that allowing subrogation would encourage economic waste, the evidence regarding the expectation of Deveau and the defendant that he would not be held liable is so overwhelmingly in his favor that the equities still clearly would compel the conclusion that subrogation should not be permitted.

although not to the same degree as was present in *DiLullo*.[11]

Turning to the expectations of the parties, there are several factors that, when viewed in their totality, convince us that neither Deveau nor the defendant would have expected Deveau to bring an action against the defendant for his negligent act even if she had lacked insurance coverage. Those factors include: the long-term, intimate relationship between the engaged, cohabiting couple; the defendant's substantial financial and in-kind contributions to the maintenance of, and building of equity in, the insured property; the defendant's consistent contributions to the payment of Deveau's insurance premiums; and Deveau's failure to inform the defendant that he was not covered under her insurance policy and should obtain his own. These facts bear on the expectations of the parties in several ways.

The Nebraska Supreme Court's decision in *Reeder* v. *Reeder*, supra, 217 Neb. 120, is instructive. In that case, the plaintiff homeowner, Theodore Reeder (Theodore), had moved out of state and permitted his brother, Bernard Reeder (Bernard), and his family to move temporarily into Theodore's home while Bernard was constructing a new home nearby. Id., 121. Bernard's family moved their belongings into Theodore's home. Id., 122. There was no lease and Bernard paid no rent,

---

[11] We disagree with the Appellate Court's limited reading of *DiLullo* in *Hartford Fire Ins. Co.* v. *Warner*, 91 Conn. App. 685, 691, 881 A.2d 1065, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005), on which the plaintiff relies, as resting on the fact that there was a multitenant building at issue in that case. In *DiLullo* v. *Joseph*, supra, 259 Conn. 854, this court concluded that economic waste would occur if the defendant tenant had been required to obtain a policy for the premises and then further noted that this waste would be multiplied because of the additional tenants in the multitenant building. See id. ("[t]his duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants").

but he paid the utility bills and performed general maintenance. Theodore paid the taxes. Id. With respect to insurance, Theodore testified that he specifically had told Bernard " 'that I would leave my insurance policy that I had on it while he was in there, and I didn't really discuss any part of his homeowner's or anything else. I just assumed he would take care of that.' " Id. Bernard's daughter accidentally started a fire that caused substantial damage to the home. After paying damages to Theodore on his homeowner's insurance, the insurer brought a subrogation action against, inter alios, Bernard's daughter. Id. The Nebraska Supreme Court affirmed the trial court's summary judgment in favor of the daughter, in effect denying subrogation. Id., 121, 123. As we previously have noted, the court first concluded that the relationship between Theodore and Bernard "has characteristics of both landlord/tenant and licensor/licensee, but of a separate and unique kind, and in this instance meriting a different treatment." Id., 124. The court then concluded that, "in this case, the issue is not whether, absent insurance, [Theodore] *could* sue his brother or his niece, but whether the relationship between [Theodore] and his brother was such, however characterized, that by permitting the [insurer] to sue [Bernard], *in effect* the [insurer] is suing [its] insured. This we believe the [insurer] may not do." (Emphasis added.) Id., 127. In light of Theodore's assurance to his brother that he would maintain his homeowner's policy during the brother's stay, the court concluded that "[i]t is difficult to see how the insurance was not for the benefit of [Bernard's family] to the same extent as it was for [Theodore's family]." Id., 128. Because the insurer's action was tantamount to suing Theodore, the insured brother, the court concluded that subrogation was not appropriate.[12] Id., 129; see also *Jindra* v. *Clayton*, 247

---

[12] We note that the court in *Reeder* concluded that the relationship at issue was more akin to "that of a host and a guest," but did not conclude that such a categorization was dispositive. *Reeder* v. *Reeder*, supra, 217 Neb. 125–26. In *Wasko* v. *Manella*, supra, 269 Conn. 549 n.18, we had rejected

Neb. 597, 606, 529 N.W.2d 523 (1995) ("relationship between the [parents] and the [daughter's family] is such that if [the parents' insurer] were permitted to maintain this subrogation action it would be, in effect, suing its own insured").

Similarly, in the present case, the relationship between the defendant and Deveau defies precise categorization under property law and weighs against allowing equitable subrogation.[13] Although Deveau did

---

the Appellate Court's reliance on the reasoning in *Reeder* because the case before this court "involved a more distant relationship between the parties, a much shorter stay at the home and no explicit reference by the hosts that the guest's actions would be covered under their insurance policy." In the present case, as we already have recognized, there is a close relationship between the parties, there was a considerably longer period of residence by the defendant on the insured premises than in *Reeder*, the defendant's residency was expected to be permanent and Deveau's actions reasonably can be interpreted to indicate that she considered her policy to be for the defendant's benefit as well as her own.

[13] Although the mere *status* of Deveau and the defendant as a nonmarried cohabiting couple does not give rise to property rights; see *Loughlin* v. *Loughlin*, 280 Conn. 632, 643, 910 A.2d 963 (2006) ("cohabitation in and of itself does not create any legal or support obligations"); we note that this court has recognized that, under various equitable and legal theories, the *conduct* of such cohabiting couples can create a right to property distribution in the cohabitant without legal title or create a right to repayment for goods and services. See *Boland* v. *Catalano*, 202 Conn. 333, 340–41, 521 A.2d 142 (1987) ("[C]ourts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. . . . In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case." [Internal quotation marks omitted.]); *Salzman* v. *Bachrach*, 996 P.2d 1263, 1267–68 (Colo. 2000) (citing and relying on case law from majority of jurisdictions recognizing equitable and legal basis of claims between nonmarried cohabiting couples); see generally note, "The Necessity and Enforcement of Cohabitation Agreements: When Strings Will Attach and How to Prevent Them—A State Survey," 37 Brandeis L.J. 245 (1998).

We note that, in the present case, testimony from the defendant and Deveau reflect that they viewed the insured property as belonging to them

not make an *express* representation to the defendant that she was maintaining the coverage for both of their benefit, as the brother did in *Reeder*, equity compels us to conclude that her actions in reaching an agreement with him whereby she regularly accepted his substantial contribution to her homeowner's policy premiums without informing him that this payment would not protect him from liability were tantamount to such an expression. "Courts have long recognized that where one party has agreed with another to obtain insurance for their mutual protection, the insurer will not be allowed to recover its losses from the noninsured party by means of subrogation or indemnity." *United States Fidelity & Guaranty Co.* v. *Aetna Casualty & Surety Co.*, 418 F.2d 953, 955 (8th Cir. 1969); compare *Page* v. *Scott*, 263 Ark. 684, 687, 567 S.W.2d 101 (1978) (allowing subrogation in absence of express or implied agreement "that insurance would be provided for the mutual protection of the parties") with *Anchor Casualty Co.* v. *Robertson Transport Co.*, 389 S.W.2d 135, 139 (Tex. App. 1965) (precluding subrogation when there was "ample evidence that [the insured] led [the third party] to believe

both because of the defendant's status as fiancé, his cohabitation and his substantial contributions to the property. Indeed, in its posttrial brief, the plaintiff conceded that the defendant and Deveau "were living together as husband and wife" and acknowledged the implied contract theory applicable to such arrangements under *Boland* v. *Catalano*, supra, 202 Conn. 340–41. Nonetheless, the defendant has not advanced a claim in the present case that he has a legal or equitable right to the insured property, nor has he contended that such rights affected the expectations he and Deveau had with regard to liability for that property and, in turn, impact whether subrogation is proper in this case. Therefore, we do not consider, and indeed need not consider, whether a third party cohabitant's legal or equitable claims vis-á-vis the insured property impacts the expectations of the parties for purposes of subrogation or otherwise impacts the subrogation rights of the insured cohabitant's insurer. Nonetheless, in light of the aforementioned case law and the defendant's substantial contributions to the insured property in the present case, we reject the dissent's view that the status of the relationship between Deveau and the defendant was so ambiguous and uncertain that it could not, as a matter of law, give rise to any expectations regarding insurance coverage.

that the [insured truck] in question was covered by collision insurance," including testimony by insured that he never intended to hold third party liable for insured truck, and "[the third party] relied upon these representations").[14] Certainly, the defendant in the present case reasonably would not have expected to be sued for causing damage to the very property for which he partially paid for insurance coverage. Cf. *Foster Estates, Inc.* v. *Wolek*, 105 N.J. Super. 339, 342, 252 A.2d 219 (1969) (concluding that subrogation action could not be brought against tenant who paid for policy even though landlord, and not tenant, was only named insured).

The fact that Deveau and the defendant were mutually economically dependent also likely affected their reasonable expectations regarding liability. The effect of an action against the defendant necessarily would be the depletion of his resources and, in turn, the shift of part of his financial burden vis-á-vis the home the parties shared back to Deveau.[15] Deveau therefore reasonably viewed the plaintiff's action against the defendant as tantamount to a recovery of those funds from her and a deprivation of the intended value of her home-

---

[14] We note that this line of cases, as well as the Nebraska Supreme Court's decision in *Reeder*, is based in part on the premise that the third party is an implied coinsured. See *Aetna Ins. Co.* v. *Craftwall of Idaho, Inc.*, 757 F.2d 1030, 1031–32 (9th Cir. 1985); *Tri-Par Investments, LLC* v. *Sousa*, 268 Neb. 119, 129–30, 680 N.W.2d 190 (2004). In *DiLullo* v. *Joseph*, supra, 259 Conn. 853, this court rejected the implied coinsured rationale in the context of the landlord-tenant relationship. See id. ("a tenant is not a coinsured on his landlord's fire insurance policy simply because he has an insurable interest in the premises and pays rent"). We do not depart from that view in the present case and simply rely on these decisions to the extent that they address the expectations of the parties and the effect of those expectations. We do not view the defendant as a coinsured who would have been entitled to recover under Deveau's contract.

[15] We are mindful that, prior to the trial court's judgment in the present case, the defendant and Deveau ended their engagement. Nonetheless, we consider the facts as they existed at the time that the potential liability arose.

owner's policy. As *Reeder* instructs, subrogation is not favored when the effect is as if the action were brought against the insurer's own insured. See generally *Home Ins. Co.* v. *Pinski Bros., Inc.*, 160 Mont. 219, 226, 500 P.2d 945 (1972) ("No right of subrogation can arise in favor of an insurer against its own insured since, by definition, subrogation exists only with respect to rights of the insurer against third persons to whom the insurer owes no duty. . . . To allow subrogation under such circumstances would permit an insurer, in effect, to pass the incidence of the loss, either partially or totally, from itself to its own insured and thus avoid the coverage which its insured purchased." [Citations omitted.]); see *Continental Divide Ins. Co.* v. *Western Skies Management, Inc.*, 107 P.3d 1145, 1148 (Colo. App. 2004) (citing this general antisubrogation rule); *American Family Mutual Ins. Co.* v. *Auto-Owners Ins. Co.*, 757 N.W.2d 584, 589 (S.D. 2008) (same). Indeed, the effect on Deveau implicates the principle that "relief by way of subrogation will not be granted where it would work an injustice or where innocent persons would suffer, or where the result would be inimical to public policy." 73 Am. Jur. 2d, supra, 554, § 11.

Accordingly, we conclude that the totality of the circumstances in the present case convinces us that the equities clearly weigh against subrogation. In so concluding, we are not unmindful that precluding subrogation may cause some injustice to the plaintiff. After all, Deveau did not notify the plaintiff that the defendant had become a permanent resident of the insured premises. As this court previously has noted, however, "[w]e think that our law would be better served . . . by leaving it to the specific agreement of the parties if they wish a different rule to apply to their, or their insurers', relationship." *DiLullo* v. *Joseph*, supra, 259 Conn. 854. In the present case, the policy at issue permitted the plaintiff to adjust Deveau's premium or coverage, with appropriate notice and within a specified period, if she

failed to inform the plaintiff "of any change in title, use or occupancy of the residence premises."[16] The policy also permitted the plaintiff to void the policy if Deveau "intentionally conceal[ed] or misrepresent[ed] any material fact or circumstance . . . before or after a loss." Presumably, because the plaintiff paid Deveau for her loss despite her failure to notify it that the defendant was living on the insured premises, the defendant's residency was not deemed a misrepresentation or intentional concealment of a material fact.[17]

[16] Under the section entitled "Coverage Changes," the policy provided in relevant part: "The coverage provided and the premium for the policy is based on information you have given us. You agree to cooperate with us in determining if this information is correct and complete and to inform us of any change in title, use or occupancy of the residence premises. You agree that if this information changes, is incorrect or incomplete, we may adjust your coverage and premium accordingly by giving you notice within [sixty] days of the policy effective date. . . ."

[17] The dissent contends that it is unfair to deny equitable subrogation in the present case because the plaintiff had no knowledge of the expectations of Deveau and the defendant regarding the insured property. It further contends that denying subrogation would create a "bizarre" result because such a result would not give effect to a provision in Deveau's policy, which is statutorily mandated, under which she has agreed to assign claims that she has against third parties to the plaintiff. These contentions, however, are at odds with our analysis in *DiLullo* and *Wasko*.

Our discussions of the expectations of the parties in both cases focused solely on the relationship between the insured and the third party. See *Wasko* v. *Manella*, supra, 269 Conn. 547 ("[u]nlike tenants, social guests have not signed a contract with the host, they have not paid the host any set amount of money for rent, and, accordingly, they do not have the same expectations regarding insurance coverage for the property as do tenants"); *DiLullo* v. *Joseph*, supra, 259 Conn. 851 ("[W]e recognize that tenants and landlords are always free to allocate their risks and coverages by specific agreements, in their leases or otherwise. The question posed by this appeal, however, is what the appropriate default rule of law should be where, as here, th[ose] parties have not made such an agreement."); *DiLullo* v. *Joseph*, supra, 854 ("neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them"). In neither *Wasko* nor *DiLullo* did we consider whether the parties had communicated their expectations to the insurer.

This court has, however, recognized the principle that an insurer should be allowed to choose whom it insures. See *DiLullo* v. *Joseph*, supra, 259

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to render judgment for the defendant.

In this opinion NORCOTT, PALMER, VERTEFEUILLE and McLACHLAN, Js., concurred.

ROGERS, C. J., concurring. I agree with the conclusion of the majority and the dissent that the trial court improperly failed to exercise its discretion when it failed to balance the equities to determine whether the particular facts of this case weigh in favor of subroga-

Conn. 853. Therefore, as we previously have noted; see footnote 14 of this opinion; this court has declined to treat a party who is not a named insured as having the rights of a coinsured simply because of that party's expectations. *DiLullo* v. *Joseph*, supra, 853. Consistent with that view, in the present case, the defendant never has claimed that he is entitled to recover for damage to his personal effects under the policy simply because he contributed to the premiums. Therefore the holding in this case imposes no greater liability on the insurer than it had agreed to insure under the terms of Deveau's policy.

Finally, the dissent's position that the subrogation provision in Deveau's policy must be given effect in the present case is contradicted by the very case law it cites, wherein we expressly have rejected such a per se rule in favor of a fact-specific consideration of the equities. See *Wasko* v. *Manella*, supra, 269 Conn. 533–34 ("while [a] right of true [equitable] subrogation may be provided for in a contract . . . the exercise of the right will . . . have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing" [internal quotation marks omitted]); id., 535 ("The Connecticut legislature has enacted a standard form of fire insurance, with which all fire insurance policies issued in this state must conform. . . . We conclude that [the subrogation] provision, when incorporated into a contract for fire insurance issued in this state, does not provide the insurer with an inviolate statutory right of subrogation." [Citations omitted.]); id., 539 ("rather than interpret the standard form of fire insurance as providing statutory rights, we consistently have interpreted it as merely setting forth legislatively mandated contractual terms, which, once incorporated into an insurance policy, are contractual terms that may be 'trumped' by principles of equity"). There is no substantive difference between the assignment provision at issue in *Wasko* and the one in Deveau's policy.

tion. Because this is a question of equity, however, I believe we should remand the case to the trial court rather than decide for ourselves whether subrogation is proper.

The majority and the dissent both claim there is no need to remand this case to the trial court because the equities are so one-sided that there is only one proper conclusion for the trial court to reach. Yet, after weighing the equities, the majority and the dissent reach opposite conclusions regarding the direction in which the equities tip. Because the majority and the dissent are able to make plausible arguments in support of completely opposite results, there is clearly room for the trial court to exercise its discretion on remand.

"The determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Wasko* v. *Manella*, 269 Conn. 527, 542, 849 A.2d 777 (2004). "It is well established that the authority to exercise [such] judicial discretion . . . is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court in its exercise. . . . Nothing short of a conviction that the action of the trial court is one which discloses [a] clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *National Elevator Industry Pension, Welfare & Educational Funds* v. *Scrivani*, 229 Conn. 817, 823, 644 A.2d 327 (1994).

To determine whether the plaintiff, Allstate Insurance Company, has a subrogation right, the trial court must balance the equities by accounting for the many factors relating to the expectations of the parties and potential economic waste. See *DiLullo* v. *Joseph*, 259 Conn. 847, 851, 792 A.2d 819 (2002). Rarely will a reviewing court find that there is only one right answer when a trial court makes such a determination based on multiple

concerns. See *Wasko* v. *Manella,* supra, 269 Conn. 543 ("In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." [Citations omitted; internal quotation marks omitted.]). This is particularly so with questions of equity. See *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283, 649 A.2d 518 (1994) ("[t]his limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court"). Moreover, we afford trial courts broad discretion to make determinations requiring the balancing of multiple factors because trial courts are often in a better position to make this type of determination. See, e.g., *Hannon* v. *Redler,* 117 Conn. App. 403, 417, 979 A.2d 558 (2009) ("the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties" [internal quotation marks omitted]); see also *New England Custom Concrete, LLC* v. *Carbone,* 102 Conn. App. 652, 667, 927 A.2d 333 (2007) ("[W]hether any award is to be made and the amount thereof lie within the discretion of the trial court, which is in the best position to evaluate the particular circumstances of a case. . . . The defendants are entitled to an opportunity to make their case for attorney's fees, but this court is not the proper forum for that presentation." [Citation omitted; internal quotation marks omitted.]).

Although I agree with the majority's determination that the equities weigh heavily in favor of the named defendant, Stephen Palumbo,[1] the question of what

---

[1] See footnote 1 of the majority opinion.

equity requires in a given situation is often a question on which reasonable minds can differ. Therefore, in my view, the trial court has discretion based on its observations and findings to balance the equities subject to an abuse of discretion review by this court.

Accordingly, I would reverse the judgment of the Appellate Court and remand the case to that court with direction to reverse the judgment of the trial court and to remand the case to that court for further proceedings according to law.

ZARELLA, J., dissenting. Twice before, this court has considered the doctrine of equitable subrogation in determining tortfeasor liability under a property owner's insurance policy. In *DiLullo* v. *Joseph*, 259 Conn. 847, 848, 792 A.2d 819 (2002), we concluded that, in the absence of an express agreement between the landlord and the tenant, the insurance carrier could not recover against the tenant for negligently causing a fire that damaged the leased premises. Conversely, in *Wasko* v. *Manella*, 269 Conn. 527, 529, 849 A.2d 777 (2004), we permitted the insurance carrier to recover against a social guest for negligently causing a fire that damaged the personal residence of the host. The majority now relies on our reasoning in *DiLullo* and *Wasko* to preclude recovery by the plaintiff, Allstate Insurance Company, against the named defendant, Stephen Palumbo,[1] for the negligent installation of an electric water heater that resulted in a fire while he and the insured homeowner, Lisa Deveau, were living together and sharing housing expenses as an unmarried couple. The majority reasons that the defendant was neither a tenant nor a social guest while living with Deveau and that the equities "clearly weigh against allowing" the present subrogation action. I agree with the majority that the

---

[1] We hereinafter refer to Palumbo as the defendant.

defendant was neither a tenant nor a social guest and that we must consider equitable principles of subrogation in resolving the issue of liability. I do not agree, however, with the majority's analysis. In focusing almost exclusively on the defendant's contribution to household expenses and his purported expectation of coverage under Deveau's insurance policy, the majority neglects to credit, or even to consider, that the defendant was not a named insured under the policy, that the policy included a special endorsement expressly assigning to the plaintiff Deveau's right of recovery against any third party responsible for fire damage to her property, that the doctrine of equitable subrogation almost always holds the tortfeasor liable for his or her negligent conduct, that the exception to tortfeasor liability carved out in *DiLullo* was based on Connecticut's strong public policy against economic waste and thus was intended to be narrow, and that precluding the plaintiff from pursuing this subrogation action against the defendant will have the effect of unfairly burdening insured property owners with higher premiums to offset uncompensated losses borne by their insurers. The majority thus fails not only to balance the equities among all of the parties in this case, but to recognize that the equities weigh so heavily in favor of the plaintiff that the trial court could have reached no other conclusion but that the subrogation action should proceed. Accordingly, although I agree with the majority that the case need not be remanded to the trial court, I respectfully dissent from its conclusion that the Appellate Court's judgment should be reversed.

It is well established that "[s]ubrogation is an equitable doctrine that permits an [i]nsurance company to assert the rights and remedies of an insured against a third party tortfeasor." *Chandler* v. *State Farm Mutual Automobile Ins. Co.*, 596 F. Sup. 2d 1314, 1317 (C.D. Cal. 2008), aff'd mem., 598 F.3d 1115 (9th Cir. 2010).

"The object of [equitable] subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. . . . As now applied, the doctrine of equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. . . . Subrogation is a highly favored doctrine . . . which courts should be inclined to extend rather than restrict." (Citations omitted; internal quotation marks omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 371–72, 672 A.2d 939 (1996).

In seeking to impose ultimate responsibility for a wrong or loss on the party who, in equity, ought to bear it, the insurer, or paying party, "steps into the shoes of the party who suffered the loss . . . for purposes of enforcing the latter's rights . . . ." G. Veal, "Subrogation: The Duties and Obligations of the Insured and Rights of the Insurer Revisited," 28 Tort & Ins. L.J. 69, 70 (1992). The insurer's right to reimbursement, however, is qualified by the equitable principle of "superior equities," which holds that "an insurer may not be allowed to recover from any party whose equities are *equal or superior to* the insurer's. In comparing the relative positions of the subrogee [insurer] and the subrogation defendant, the court decides who ultimately should bear the loss. Sometimes called balancing the equities, the doctrine draws upon the court's concept of fairness and, where apposite, the perceived intent of the parties." (Emphasis added; internal quotation marks omitted.) Id., 70–71. In short, "[t]he right of subrogation is . . . a means of balancing the equities as between the insurer, the insured, and the third party

tortfeasor." *Chandler* v. *State Farm Mutual Automobile Ins. Co.*, supra, 596 F. Sup. 2d 1320.

Although there is no clear formula for determining the superiority of the equities in any given case, the fact that the insured pays a premium for the sole purpose of transferring its risk means that it always has equities superior to those of the insurer. G. Veal, supra, 28 Tort & Ins. L.J. 71. Once the insured is fully compensated, however, the principle of unjust enrichment operates in two different ways to justify the insurer's recovery against the tortfeasor. Subrogation first prevents the insured who has been fully compensated from becoming unjustly enriched by bringing an action against the tortfeasor and receiving a double recovery. E.g., *Chandler* v. *State Farm Mutual Automobile Ins. Co.*, supra, 596 F. Sup. 2d 1320; see also *Wasko* v. *Manella*, supra, 269 Conn. 548; *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 367. Subrogation also prevents the tortfeasor from becoming unjustly enriched by the insurer's payment of a debt for damages truly owed by the one who caused the loss. See, e.g., *Wasko* v. *Manella*, supra, 548; *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 367. Consequently, the wrongdoer, being the culpable party and the ultimate cause of the loss, generally "loses to the superior equities of the insurer." G. Veal, supra, 71. Other factors that this court has considered in determining liability in subrogation actions are Connecticut's strong public policy disfavoring economic waste and the respective expectations of subrogation on the part of the insurer and the tortfeasor. See *Wasko* v. *Manella*, supra, 545–47; see also *DiLullo* v. *Joseph*, supra, 259 Conn. 851, 854. "The determination of what equity requires in a particular case . . . is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 542, quoting *Kakalik* v. *Bernardo*, 184 Conn. 386, 395, 439 A.2d 1016 (1981).

In the present case, I agree with the majority's preliminary conclusion that, because the trial court incorrectly characterized the relationship between Deveau and the defendant as that of a host and social guest, it improperly decided the case on that ground and failed to address the defendant's claim that it was inequitable, under the facts, to allow subrogation. I also agree with the majority that we need not remand the case to the trial court to address that claim. Unlike the majority, however, I believe that the reason why we need not remand the case is because the equities weighing in favor of the plaintiff are so clearly superior to those weighing in favor of the defendant that the trial court could have reached no other conclusion but to permit the subrogation action to proceed. Consequently, I would affirm the judgment of the Appellate Court.

To my knowledge, no other jurisdiction has considered the equities in a similar context involving a cohabiting unmarried couple. Accordingly, this court is plowing new legal ground and must approach the issue with care. The majority decides that the equities weigh against the subrogation action after conducting an analysis of economic waste and the expectations of the defendant and Deveau under *DiLullo*, *Wasko* and a Nebraska case in which the insured homeowner's niece caused a fire while she and her immediate family were living temporarily as the home's sole occupants. See *Reeder* v. *Reeder*, 217 Neb. 120, 348 N.W.2d 832 (1984). With respect to economic waste, the majority observes that the only property on which the defendant could have obtained liability coverage for negligence was Deveau's home, but, because Deveau had fully insured the property, another policy necessarily would have been "to some extent . . . duplicative" of her coverage and economically wasteful. The majority then considers the expectations of Deveau and the defendant and concludes that neither would have expected Deveau to sue

the defendant for his negligence, even if she had lacked insurance coverage, because (1) the two had a long-term, intimate relationship that they anticipated would lead to marriage, (2) the defendant had made substantial financial and in-kind contributions to the maintenance of, and building of equity in, Deveau's home, (3) the defendant consistently contributed to Deveau's insurance premiums, and (4) Deveau failed to inform the defendant that he was not covered under her insurance policy and should obtain his own policy. In reaching this conclusion, the majority relies in part on *Reeder*. In that case, the Supreme Court of Nebraska determined that, because the absentee homeowner had told his brother, whose family was temporarily occupying the home, that he had procured insurance coverage on the premises and that the coverage would be maintained during his brother's occupancy, the insurer was, in effect, insuring the property for the benefit of the brother as well as for the benefit of the owner. Id., 122, 128–29. Accordingly, a subrogation action would be tantamount to suing the insured. See id., 128. The majority therefore concludes, without considering the equitable factors weighing in favor of the plaintiff, that the plaintiff should not be allowed to bring the present subrogation action against the defendant. I disagree with the majority's narrow construction of *DiLullo*, its heavy reliance on the defendant's expectations, which never were communicated to the plaintiff, and its failure to consider the equitable factors weighing in favor of the plaintiff in balancing the equities in this case, and suggest, instead, that a more careful reading of our precedent and a full and fair consideration of the equities on *all* sides of the dispute compel a different result.

I

I begin with the concept of economic waste, which is a matter of policy rather than an equitable consideration. In *DiLullo*, which involved a landlord-tenant rela-

tionship, we determined that it would be "inappropriate to create a default rule that allocates to the tenant the responsibility of maintaining sufficient insurance to cover a claim for subrogation by his landlord's insurer. Such a rule would create a strong incentive for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the replacement cost, of the entire building, *irrespective of the portion of the building occupied by the tenant.* That is precisely the same value or replacement cost insured by the landlord under his fire insurance policy. Thus, although the two forms of insurance would be different, the economic interest insured would be the same. This duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants." (Emphasis added.) *DiLullo* v. *Joseph*, supra, 259 Conn. 854.

We subsequently explained in *Wasko* that the same rationale did not apply to the relationship of a host and social guest and that we had no concern regarding economic waste in that context because a social guest could be expected to carry liability coverage under his or her homeowner's or renter's insurance policy. The guest thus would not need to purchase an additional or temporary first party fire insurance policy on the property of the host. *Wasko* v. *Manella*, supra, 269 Conn. 545–46. Furthermore, an insured host could be expected to bring an action directly against the guest. Id., 546. Consequently, we could see no reason why it was equitable to permit a property owner to recover for damages against a negligent guest, yet inequitable to permit the insurer to seek the same recovery after compensating the insured. Id.

Although the defendant in the present case was neither a tenant nor a social guest, the underlying rationale of *Wasko* is far more applicable in these circumstances

than the rationale we articulated in *DiLullo*. I agree with the majority that we viewed the tenant's acquisition of liability coverage under the facts of *DiLullo* as economically wasteful because it would be duplicative of the landlord's coverage. Such coverage was deemed to be duplicative and wasteful in *DiLullo*, however, because every tenant would be required to insure *"the entire building, irrespective of the portion of the building occupied by the tenant."* (Emphasis added.) *DiLullo* v. *Joseph*, supra, 259 Conn. 854; see also *Wasko* v. *Manella*, supra, 269 Conn. 545 (noting our conclusion in *DiLullo* that "forcing a tenant to carry insurance for the *full cost* of the building would create economic waste, as it would be duplicative of the insurance carried by the landlord" [emphasis added]). In other words, when we spoke in *DiLullo* of the problem being "compounded" by the number of tenants in a multiunit building, our concern was not that each unit would be separately insured by the tenant and the landlord, which would result in two policies for every unit, but that the *entire building* would be insured by the landlord and all of its occupants. In a 100 unit building, this could mean that there would be 100 policies covering each and every unit, which clearly would constitute economic waste because the cumulative cost of 100 duplicative policies would be extremely high. In contrast, the concept of economic waste is inapplicable in the present case because only a single residence is involved, and the defendant testified that he occupied the residence in its entirety. Accordingly, there can be no issue regarding duplicative insurance on portions of the home that the defendant did not occupy.

The present case is more like *Wasko*, which involved a subrogation action brought against a social guest for negligently causing fire damage to the personal residence of the host. *Wasko* v. *Manella*, supra, 269 Conn. 529–30. In dismissing the idea that duplicative insurance

would be required for every property visited by a social guest if the subrogation action was allowed, we applied the presumption that the negligent acts of a social guest are covered by his or her existing homeowner's or renter's insurance policy. See id., 546. We also applied the presumption that a host could be expected to proceed directly against a social guest. See id. I see no reason why the same presumptions should not apply to a person who is living with an insured homeowner as an unmarried couple and sharing housing expenses. As in the case of a social guest, we may presume that such a person would obtain renter's insurance[2] or seek to be added to the homeowner's policy. A separate policy carried by the nonowning occupant would be only partially duplicative of the owner's policy because a primary purpose of renter's insurance is to protect the renter's personal property, which would not be protected under the homeowner's policy.[3] See 10A G. Couch, Insurance (3d Ed. 2005) § 148:7, p. 148-14 ("[b]y definition, a policy of property insurance inures only to the benefit of the insured"). Any duplication arising from the fact that both members of the couple must carry insurance would occur principally with respect to liability and would be no different from the liability coverage obtained by a social guest under a renter's or homeowner's insurance policy. In addition, the ambiguous status of an unmarried couple allows for the presumption that the homeowner, instead of seeking compensation from the insurer, might proceed against the tortfeasor at some future time to recover for the loss. I therefore would conclude that Connecticut's

---

[2] "It is common business practice for tenants to obtain their own renter's insurance policy to cover their liability for losses they cause to third parties." *Hacker* v. *Shelter Ins. Co.*, 388 Ill. App. 3d 386, 393, 902 N.E.2d 188 (2009).

[3] In this regard, it should be noted that the trial court's last finding of fact was that the plaintiff was seeking reimbursement from Deveau for money improperly paid to her for the loss of certain personal property damaged by the fire but owned by the defendant.

strong public policy disfavoring economic waste does not preclude a subrogation action by the plaintiff.

## II

With respect to the parties' expectations, which this court previously has considered in weighing and balancing the equities, we briefly noted in *DiLullo* that "neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them." *DiLullo* v. *Joseph*, supra, 259 Conn. 854. In *Wasko*, we further observed that "social houseguests do not proceed with the same lack of expectations regarding personal responsibility for negligent conduct as do tenants. . . . [M]ost social guests fully expect to be held liable for their negligent conduct in another's home—whether that conduct constitutes breaking the television, causing physical injury, or burning the house down. Unlike tenants, social guests have not signed a contract with the host, they have not paid the host any set amount of money for rent, and, accordingly, they do not have the same expectations regarding insurance coverage for the property as do tenants." *Wasko* v. *Manella*, supra, 269 Conn. 547. We then considered the equities and concluded that there was "no logical reason for the defendant [in *Wasko*] to be unjustly enriched merely because he burned down the home of a party that had the foresight to purchase fire insurance, and subsequently chose to submit a claim to that insurance company rather than to proceed directly against him." Id., 549. We finally determined that "[p]recluding an insurer from bringing a subrogation action against a social [guest]" might "encourage insurers to attempt to deny coverage for losses to property they insure, given that the insured party would maintain the right to proceed against the responsible party, while the insurer would not." Id., 550.

The majority ignores what we described in *Wasko* as "the main principle behind equitable subrogation," namely, granting the insurer "the opportunity to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it"; (internal quotation marks omitted) id.; and turns what should be an analysis of the expectations of *all* of the interested parties—the insurer, the insured and the defendant—into a totality of the circumstances test that omits *any* consideration of the insurer's expectations. Accordingly, the majority's conclusion that the plaintiff is not entitled to bring a subrogation action against the defendant is based on an improper understanding of the law.

The defendant argues that he expected to be covered under Deveau's insurance policy because he contributed an equal share to the couple's living expenses, including payments on her insurance premiums, made improvements to the property, was living with Deveau and her daughter as a family when the fire occurred and did not believe that he could obtain renter's or homeowner's insurance, even though he apparently made no attempt to do so.[4] In my view, however, these

---

[4] The defendant's arguments are confirmed in part by the trial court's limited findings that (1) Deveau purchased the property on or about June 15, 1999, and is the "sole record title owner" and "sole mortgagee," (2) no one has claimed a leasehold interest in the property, (3) the defendant moved into Deveau's home on or about February, 2001, as Deveau's "live-in boyfriend/fiancé" and vacated the premises on or about October, 2005, (4) during the time that they were living together, the defendant and Deveau shared expenses for the residence, which varied from month to month, (5) Deveau was the "sole named insured" on the homeowner's insurance policy issued by the plaintiff, (6) the defendant never made a security deposit and never had an oral or written lease with Deveau, (7) Deveau and her daughter shared the entire house with the defendant, and no one had exclusive use of any particular area, (8) during his occupancy, the defendant performed many improvements and maintenance functions, as if he was an owner, (9) the defendant never asserted any ownership interest in the premises, (10) on January 31, 2002, the premises caught on fire, which caused damages to the premises and personal property therein, (11) the defendant conceded at trial that he was responsible for the fire due to his negligent installation of a heat pump, (12) as a result of the fire, the plaintiff was required under

expectations, when weighed against the plaintiff's expectations, are insufficient to preclude the plaintiff from pursuing a subrogation action against the defendant.

Because the defendant conceded that his negligence was the cause of the fire, the plaintiff reasonably could have expected under well established principles of equitable subrogation that the defendant in all good conscience should pay for the damages sustained by the insured. See, e.g., *Wasko* v. *Manella*, supra, 269 Conn. 550. The defendant was not the record title owner of the property, was not the named insured, never asserted an ownership interest in the property, never had an oral or written lease with Deveau and never informed the plaintiff that he was living with Deveau. The plaintiff thus had no knowledge that the defendant was residing in the home before the fire occurred and had no opportunity to reassess and adjust the insurance premium, consider adding the defendant to the list of covered persons or advise the defendant to obtain renter's insurance because he was not covered under the policy.

Furthermore, the fire insurance endorsement included in Deveau's policy specifically provided that the insurer could "require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made . . . ." Although we determined in *Wasko* that such an endorsement, which, under General Statutes § 38a-308,[5] must

Deveau's insurance policy to pay her $62,615.25 for structural damages, damages to her personal property and relocation expenses, and (13) during closing argument, the plaintiff conceded that it had paid Deveau $1121.96 in error, a sum that reflected the value of the defendant's property and for which it was seeking reimbursement. Among the facts on which the defendant relies that the trial court did *not* find are that he made payments on Deveau's insurance premium and that both he and Deveau believed that he was insured under her policy.

[5] General Statutes § 38a-308 provides in relevant part: "(a) No policy or contract of fire insurance shall be made, issued or delivered by any insurer or any agent or representative thereof, on any property in this state, unless

be included in all fire insurance policies issued in Connecticut, does not grant the insurer "an inviolate statutory right of subrogation"; *Wasko* v. *Manella,* supra, 269 Conn. 536; the endorsement nonetheless instructed Deveau that she might be "require[d]" to assign the plaintiff her right of future recovery against a third party tortfeasor for fire damage caused by his or her negligence. The plaintiff and Deveau thus presumptively understood that the plaintiff could seek recovery against a third party tortfeasor, such as the defendant, under the terms of her policy.

The majority's decision produces a truly bizarre result because the plaintiff is now prohibited from bringing a subrogation action against the defendant on *equitable* grounds even though Deveau could have been required to assign her right of recovery to the plaintiff under an *express provision* in her insurance policy, a provision, it should be emphasized, that Deveau not only consented to but that is required by statute to be included in every homeowner's insurance policy in this state. This result could not have been what the legislature intended. To the contrary, if the legislature believed that it is fair to mandate the inclusion of such a provision in the insurance policies of all Connecticut homeowners

it conforms as to all provisions, stipulations, agreements and conditions with the form of policy set forth in section 38a-307. . . ."

General Statutes § 38a-307 provides in relevant part: "Subrogation. This Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company."

Subsection (b) of § 38a-308 allows insurers to issue a nonconforming policy as long as "(1) such policy or contract shall afford coverage, with respect to the peril of fire, not less than the substantial equivalent of the coverage afforded by said standard fire insurance policy, (2) the provisions in relation to mortgagee interests and obligations in said standard fire insurance policy shall be incorporated therein without change, (3) such policy or contract is complete as to all of its terms without reference to any other document and (4) the [insurance] commissioner is satisfied that such policy or contract complies with the provisions hereof."

and the provision has not been judicially challenged or qualified, then it would seem equally fair under the doctrine of equitable subrogation to allow the plaintiff to bring a subrogation action against the defendant for the exact same recovery. Indeed, we expressly recognized in *Wasko* the close connection between the legislative mandate and the underlying equitable right when we stated that, "while [a] right of true [equitable] subrogation may be provided for in a contract . . . the exercise of the right will . . . have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing." (Internal quotation marks omitted.) Id., 533–34, quoting 83 C.J.S., Subrogation § 3 (b) (1953); see also *Hartford Accident & Indemnity Co.* v. *Chung*, 37 Conn. Sup. 587, 592, 429 A.2d 158 (1981) ("[t]he right of legal subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect"); M. Quinn, Review Essay, "Subrogation, Restitution, and Indemnity," 74 Tex. L. Rev. 1361, 1389 (1996) ("It is puzzling why insurance contracts contain contractual subrogation clauses when subrogation is automatic . . . . [T]he subrogation agreement can express nothing more than what the law would automatically provide."); S. Kimball & D. Davis, "The Extension of Insurance Subrogation," 60 Mich. L. Rev. 841, 842 (1962) ("[a]lthough subrogation clauses are very common in insurance policies, on the whole they merely confirm rights that would exist without them, and at most they alter the incidents of legal subrogation in some particulars"); 73 Am. Jur. 2d 558, Subrogation § 15 (2001) ("[e]quitable subrogation is committed to the equitable powers of the court which, in the exercise of its discretion, may be awarded and although these powers may

be confirmed by contractual provisions, they may not be expanded by them").[6]

The plaintiff also could have been expected to bring a subrogation action against the defendant for the same reason we concluded in *Wasko* that the insurer could bring a subrogation action against a social guest, namely, the insured's reluctance in some cases to proceed directly against a person with whom he or she may have more than a passing acquaintance. See *Wasko* v. *Manella*, supra, 269 Conn. 549 ("one of the benefits of purchasing [homeowner's] insurance is that the insureds need not sue their guests who negligently cause damage, even though they would be within their rights to do so" [internal quotation marks omitted]); see also *Reeder* v. *Reeder*, supra, 217 Neb. 129 ("[i]t may be presumed that the insured bought this policy so that he would not have to look to his guest for payment in the event of damage caused by the negligent act of the guest"). Thus, in *Wasko*, we viewed subroga-

---

[6] The majority misunderstands my position. I do not believe that the subrogation provision in Deveau's policy should be given effect, as the majority declares; see footnote 17 of the majority opinion; rather, I acknowledge that the provision did *not* provide the plaintiff with "an inviolate statutory right of subrogation." *Wasko* v. *Manella*, supra, 269 Conn. 536. My point is simply that, because Deveau's policy contained the provision, she was on notice that the plaintiff *might* require that she assign her right of recovery against the defendant. The plaintiff did not require that she do so but proceeded instead to bring an equitable subrogation action outside the scope of the policy. Deveau could have expected this to happen, however, not only because she was on notice from her insurance policy that the plaintiff could have required an assignment of her right of subrogation but because we noted in *Wasko* that such a provision, which is required by statute, "ha[s] its basis in general principles of equity rather than in contract, which will be treated as being merely a declaration of principles of law already existing." (Internal quotation marks omitted.) Id., 534. I thus find bizarre the majority's view that the insurer could have proceeded with a subrogation action under Deveau's policy by requiring that she assign her right in this regard, but that the insurer cannot proceed to do the exact same thing under the equitable principles on which the statutorily required insurance provision is based.

tion actions involving persons with close relationships in a positive light because they allow the host to be compensated for the loss without damaging his or her personal relationship with the guest, and we did not regard them as hindering the insured's ability to proceed against the tortfeasor. See *Wasko* v. *Manella,* supra, 549. Consequently, although Deveau testified that she would not have sued the defendant because she expected to marry him, her disinclination to proceed against him should not be regarded as a reason to preclude the plaintiff from doing so because it is no different from the disinclination of a host to proceed against a social guest.

To the extent the defendant claims that his contributions to the household expenses, including insurance premiums, caused him to assume before the fire occurred that he was covered under Deveau's policy, the record suggests that neither he nor Deveau gave the matter any thought and thus had no expectations one way or the other. Deveau testified on more than one occasion that whether the defendant was covered under her policy was "not something [she] really thought about" and that she "never really gave it any thought." The defendant similarly testified, when asked if he "assumed" that he was covered under her policy, that he never had discussed the matter with Deveau and, therefore, "I guess my answer is yes." In fact, the defendant testified that he had never looked at the policy, never asked Deveau to show him a copy of the policy, never examined the fire insurance endorsement and did not know if he was insured under the policy "as far as the language of the policy [was] concerned." Regarding his contributions to the household expenses, he further testified that the only bill that he paid directly was the electric bill, that he usually gave varying amounts of money for household expenses to Deveau each month and that Deveau paid all of the household

bills, initially from her own checking account and later from a joint checking account with the defendant. Accordingly, the defendant made no direct payments on the mortgage or insurance premium that would have indicated an awareness that he was paying for the policy. In addition, as previously discussed, there is nothing in the record indicating that the defendant informed the plaintiff that he was contributing to the household expenses, that he assumed that he was covered under Deveau's policy or that Deveau ever told him he was covered under the policy. In light of these facts, there is no tangible evidence that the defendant considered the matter of insurance before the fire occurred or that he had expectations of any kind as to whether he was covered.

Even if we fully credit the defendant's claim that he assumed that he was covered, equitable principles require, first, that we consider the issue from an objective standpoint and, second, that the expectations of the insurer be weighed in balancing the equities. With respect to an objective standard, we stated in *DiLullo* that the precise issue before the court was: "[W]hat should be the rule of law that governs in the typical default situation?" *DiLullo* v. *Joseph*, supra, 259 Conn. 851. Similarly, we stated in *Wasko* that the issue before the court was: "Did the Appellate Court properly . . . extend this court's opinion in *DiLullo* . . . in the context of landlord/tenant, by holding that a guest in a personal residence is immune from liability for negligently caused damages in a subrogation action brought by the homeowner's insurance carrier?" (Citation omitted; internal quotation marks omitted.) *Wasko* v. *Manella*, supra, 269 Conn. 531. Indeed, the court in *Wasko* never discussed whether the guest possessed renter's or homeowner's insurance or actually expected to be covered under the host's insurance policy. Thus, to remain consistent with our prior cases, this court

must rely on reasonable presumptions, as we did in *DiLullo* and *Wasko*, as to what an ordinary person in the defendant's situation, namely, a person living with the insured homeowner as an unmarried couple and contributing to the household expenses, should reasonably expect concerning liability for fire damage resulting from his or her negligence.

In my view, such persons should expect to be held liable for their negligence, in part because of the informal and possibly temporary nature of the relationship, which has no legal status, and in part because, when the nonowner is not a named insured under the owner's policy, the insurer has no knowledge as to the nonowner's residence in the dwelling or assumptions regarding coverage, which may vary according to the facts of each particular case. Moreover, this court having stated in *DiLullo* that a tenant should not be considered a coinsured under a landlord's fire insurance policy simply because the tenant "has an insurable interest in the premises and pays rent"; *DiLullo* v. *Joseph*, supra, 259 Conn. 853; I see no reason why the same logic would not apply in the present case. If tortfeasors who live with and are unrelated to the insured can be protected and absolved of all responsibility for their actions merely by alleging that they "expected" to be covered by policies in which they are not specifically named but for which they partially paid without the insurer's knowledge and consent, insurers will find it increasingly difficult to determine potential risk. The result will be a shifting of the financial burden away from those responsible for causing such losses onto the backs of the insured, because insurers will require higher premiums to compensate for the higher risk. This is an indefensible departure from the well established principles that inform the doctrine of equitable subrogation in this state. In light of the foregoing principles and considerations, I submit that a proper balancing of

the equities compels the conclusion that the plaintiff has the superior equities and should be allowed to proceed with a subrogation action to prevent the defendant's unjust enrichment.

The majority asserts that the expectations of the plaintiff need not be considered because the court focused in *DiLullo* and *Wasko* solely on the relationship between the insured and the third party tortfeasor and did not consider whether their expectations had been communicated to the insurer. See footnote 17 of the majority opinion. The majority thus claims that considering the plaintiff's expectations in the present case would be "at odds" with our analysis in *DiLullo* and *Wasko*. Id. I disagree.

With respect to *Wasko*, the majority overlooks the fact that this court ultimately based its conclusion that the insurer was entitled to proceed with the subrogation action on an analysis of the expectations and interests of the insurer as well as those of the insured and the third party tortfeasor. For example, we concluded our analysis of economic waste by observing that, "[i]f the insured property owner can bring an action to recover for negligently caused damages against the defendant, we see no reason why an insurer that pays for the property owner's loss cannot also bring an action against the defendant. Put another way, we see no reason why it is equitable to permit a property owner to proceed against a negligent houseguest's current insurance policy, yet it is inequitable to permit an insurance company that has paid out to its insured to proceed against that same policy." *Wasko* v. *Manella*, supra, 269 Conn. 546. With regard to the expectations of the parties, we first discussed why the expectations of a host and social guest would support a subrogation action and then stated that "[a] *more appropriate source of guidance on the equity involved in allowing subrogation* . . . [was] our decision in *Westchester*

*Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 362";
(emphasis added) *Wasko* v. *Manella*, supra, 547; in
which we invoked the principle of unjust enrichment
to conclude that the insurer was entitled to bring a
subrogation action against the third party tortfeasor
because "[t]he tortfeasor, who was the party primarily
liable for the losses sustained by the insured, benefited
by the insurer's payment of a debt truly owed by the
tortfeasor." (Internal quotation marks omitted.) Id., 548,
quoting *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*,
supra, 372. After stating that "one of the benefits of
purchasing [homeowner's] insurance is that the
insureds need not sue their guests who negligently
cause damage, even though they would be within their
rights to do so"; (internal quotation marks omitted)
*Wasko* v. *Manella*, supra, 549; we concluded that there
was "no logical reason for the [social guest] to be
unjustly enriched merely because he burned down the
home of a party that had the foresight to purchase fire
insurance, and subsequently chose to submit a claim to
[the] insurance company rather than to proceed directly
against him." Id. The court then repeated that "[p]re-
cluding an insurer from bringing a subrogation action
against a social houseguest who negligently caused a
fire that damaged the insured's property could . . .
lead to unjust results . . . [as it would be] contrary to
the main principle behind equitable subrogation
because it denies the [insurer] the opportunity to com-
pel the ultimate payment of a debt by one who, in
justice, equity, and good conscience, should pay it. . . .
[I]t may also encourage insurers to attempt to deny
coverage for losses to property they insure, given that
the insured party would maintain the right to proceed
against the responsible party, while the insurer would
not." (Citation omitted; internal quotation marks omit-
ted.) Id., 550.

In *DiLullo*, unlike *Wasko*, our reasoning was driven
primarily by Connecticut's strong public policy against

economic waste, and not by equitable considerations relating to the expectations of the landlord and the tenant. See *DiLullo* v. *Joseph,* supra, 259 Conn. 853–54. ("Our decision is founded, in large part, upon the principle that subrogation . . . invokes matters of policy and fairness. . . . We think that our law would be better served by having the default rule of law embody [the strong public] policy against economic waste, and by leaving it to the specific agreement of the parties if they wish a different rule to apply to their, or their insurers', relationship." [Citations omitted.]). Only after discussing this dispositive policy consideration did the court in *DiLullo* refer briefly to the expectations of the landlord and the tenant as further support for its conclusion that the subrogation action should not proceed, stating that "neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them." Id., 854. As to the communication of the expectations of the landlord and the tenant to the insurer, there was no issue in *DiLullo* regarding the insurer's knowledge that tenants were residing on the landlord's property like the plaintiff's lack of knowledge in the present case that the defendant was living with Deveau because the landlord's insurance policy in *DiLullo* presumably reflected that the premises were being leased. In sum, the court in *DiLullo* paid very little attention to the expectations of the parties, basing its decision primarily on public policy concerns. See id. In contrast, the court in *Wasko* considered the expectations of the insured and the third party tortfeasor but devoted far more of its attention to the inequities relating to the insurer and to the unjust enrichment of the tortfeasor that would be likely to occur if the subrogation action was not allowed to proceed. See generally *Wasko* v. *Manella,* supra, 269 Conn. 544–50. Accordingly, the analysis herein is entirely consistent with this court's reasoning in *DiLullo* and *Wasko*.

The majority also relies on *Reeder* v. *Reeder*, supra, 217 Neb. 120, in concluding that allowing the plaintiff to bring a subrogation action against the defendant would be like allowing the plaintiff to bring an action against Deveau. I disagree because the legal analysis in *Reeder* is inapposite, and the majority takes the language in *Reeder* out of context.

As noted earlier, *Reeder* involved circumstances in which the insured homeowner's brother and his family negligently caused a fire while living temporarily in the owner's home. Id., 121–22. Thereafter, upon compensating the owner for the damage, the insurer commenced a subrogation action against the brother. Id., 122. At trial, the brothers testified that, although they had entered into no formal agreement and had had little discussion regarding the terms of the brother's temporary occupancy, they had agreed informally that the brother would pay the utility bills, maintain the home and not pay any rent but that the owner would continue paying the taxes. Id. The owner also told his brother that he would leave his insurance policy in place. Id. In deciding whether to allow the subrogation action, the court stated that the relationship between the owner and his brother did not resemble that of a landlord and a tenant or a licensor and a licensee; id., 124; but was of a "separate and unique kind" more akin to that of a host and social guest. Id., 124, 125–26. The court then emphasized that the question before the court was whether the insurance carrier was, "in effect, seeking to recover from the insured himself for the very risk that the carrier insured and for which it received premiums." Id., 126. The court ultimately concluded that this was the case because *the owner testified that he expressly told his brother that he would leave his insurance policy in place* during the brother's occupancy. Id., 128. The court added that, in light of this testimony, it was "difficult to see how the insurance was not for

the benefit of the [brother] to the same extent as it was for the [owner]." Id.

In its analysis, the court quoted from a Washington case, in which the court stated that "a tenant stands in the shoes of the insured landlord for the limited purpose of defeating a subrogation claim." (Internal quotation marks omitted.) Id., 129, quoting *Rizzuto* v. *Morris*, 22 Wash. App. 951, 956, 592 P.2d 688, review denied, 92 Wash. 2d 1021 (1979). The Nebraska court then observed: "It occurs to us that if the reasoning underlying the denial of a subrogation claim applies between a landlord and a tenant, then we conclude that this reason is even more compelling when the relationship is that of host and guest, particularly when the host has assured the guest that there is insurance coverage. It may be presumed that the insured bought this policy so that he would not have to look to his guest for payment in the event of damage caused by the negligent act of the guest. We are persuaded that the relationship which existed between the brothers in this case was such that, regardless of how their relationship is characterized, a right of subrogation in the insurer against the insured's niece should not lie as a matter of law." *Reeder* v. *Reeder*, supra, 217 Neb. 129.

In my view, *Reeder* is inapposite on both the facts and the law. From a factual standpoint, it is clearly distinguishable from the present case because the court's conclusion that bringing an action against the tortfeasor would be like bringing an action against the insured was based on the fact that the owner had specifically told his brother that he would maintain insurance on the property during the brother's occupancy, which led the brother to believe that he was covered under the policy. In contrast, the record indicates that Deveau and the defendant not only failed to discuss whether he was covered under her policy, but that neither gave any thought to the matter before the fire occurred.

From a legal standpoint, *Reeder* also is distinguishable because it involved what the Nebraska court characterized as a relationship between a host and social guest, to which the court applied the presumption that a host would buy an insurance policy so that he would *not* have to seek payment from the guest in the event that the guest negligently caused damage to the property. See id., 126–28. In contrast, this court applied the opposite presumption in *Wasko* in determining that a social guest fully expects to pay for damages caused by his or her negligence to the home of the insured host. See *Wasko* v. *Manella*, supra, 269 Conn. 547. Indeed, when the court in *Wasko* examined *Reeder*, it also found the case distinguishable. Id., 549 n.18 (finding *Reeder* inapposite because it involved unique factual scenario, and there was undisputed evidence that owner had told his brother that he would leave his insurance policy in place). Accordingly, *Reeder* cannot serve as precedent in this case.

The majority loses sight of the principle that "[s]ubrogation is a highly favored doctrine . . . which courts should be inclined to extend rather than restrict." (Citation omitted.) *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 372. In *DiLullo*, we carved out a very narrow exception to the doctrine in cases involving landlords and tenants in multiple unit buildings when there was no specific agreement regarding insurance on the premises for fire or other casualty arising from the tenants' negligence. See *DiLullo* v. *Joseph*, supra, 259 Conn. 848–49, 854. We noted that such an agreement generally may be evidenced by the parties' lease or by the tenant being named as an additional insured in the landlord's policy. Id., 851 n.4. The principal reason why we embraced this exception was because "subrogation, as an equitable doctrine, invokes matters of policy and fairness"; id., 853; and there would be unacceptable economic waste if every tenant was required to bear

the cost of insuring the entire building even though he or she occupies only a portion thereof. Id., 854. We also observed that "neither landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them." Id., 854. In situations such as the present one, there would be no unacceptable economic waste if the nonowning partner living with the insured homeowner is required to obtain insurance or take steps to be included in the insured homeowner's policy. In addition, because all homeowners' insurance policies in Connecticut must contain a subrogation provision that the insured may be required to assign the right of recovery to the insurer, this court may apply the presumption that homeowners fully understand the insurer's potential subrogation rights under the policy and that similar rights very likely would exist under principles of equitable subrogation. See *Wasko* v. *Manella,* supra, 269 Conn. 539 n.10 ("[t]he legislative history of the current standard form of fire insurance . . . provide[s] some evidence" that one of primary motivations behind adoption of form was "to provide consumers with a consistent and easily understandable form of insurance"). Accordingly, there was no reason why Deveau would have needed "expert counseling" to understand her insurance policy, which put her on notice that she might be required to assign to the plaintiff her right of recovery against the defendant for fire damage caused by his negligence. Likewise, we may apply the presumption that the defendant was put on notice regarding the consequences of his potential negligence by the statutory provision on assignment. Cf. *East Village Associates, Inc.* v. *Monroe,* 173 Conn. 328, 333, 377 A.2d 1092 (1977) (amendment to statutory provision constituted notice of new provision). In light of these considerations, the plaintiff reasonably would have *expected* that it could proceed with an equitable

subrogation action, especially when neither the defendant nor Deveau had given the plaintiff notice as to the addition of a nonfamily resident to Deveau's household.

For all of the foregoing reasons, I respectfully dissent.